# United States Court of Appeals
## For the First Circuit

No. 11-2392

UNITED STATES,

Appellee,

v.

JOAN R. LAPLANTE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

Before

Thompson, Stahl, and Lipez,
Circuit Judges.

Mark E. Howard, with whom Howard & Ruoff, PLLC, was on brief, for appellant.

Seth R. Aframe, Assistant United States Attorney, with whom John P. Kacavas, United States Attorney, was on brief, for appellee.

May 8, 2013

THOMPSON, **Circuit Judge.** When Appellant Joan LaPlante's once-successful factoring business ran into serious financial trouble, she allegedly defrauded a number of lenders to obtain more money to help get her out of the mess. After a government investigation, indictment and five-day trial, a jury convicted LaPlante of mail fraud under 18 U.S.C. § 1341. LaPlante now appeals her conviction, challenging the district court's jury instructions on the elements of mail fraud and claiming ineffective assistance of counsel. Because neither argument prevails, we affirm.

## BACKGROUND

### A. The Scheme

We walk through the relevant facts in the light most favorable to the government. United States v. Hebshie, 549 F.3d 30, 32 (1st Cir. 2008). Starting in 2000, LaPlante began running a company called JRL Funding Group ("JRL"). While the company engaged in marketing, consulting and asset liquidation, much of its business involved factoring. Factoring is a business arrangement whereby a company purchases an entity's accounts receivable at a discount and collects on those accounts. The company profits when it collects more than what it paid for them. To run a factoring business in the first instance, a company needs sufficient capital to purchase another entity's receivables even at the discounted rate. To finance JRL's purchases of receivables, LaPlante obtained

loans from various companies and individuals.  She used the money she borrowed for that purpose until January 2003.

In January 2003, faced with financial woes, LaPlante's business went under and her factoring business came to a screeching halt.  Yet from January 2003 to February 2007, she continued to seek and obtain loans from individuals based upon her representation the money would be used for her factoring business (which no longer existed), borrowing anywhere from $25,000 to $550,000 from a given individual.  With respect to each loan, LaPlante and the lender executed a loan agreement describing JRL as a factoring, marketing and consulting business, and providing the interest rate on the loan.  Lenders could choose to either receive monthly interest payments or roll the interest back into the account.  Regardless of the option lenders chose, LaPlante promised to repay either one half of the funds in their account within 90 days or all of the funds within 180 days of receiving a written request for such repayment.  Each month, LaPlante mailed lenders an account statement reflecting the principal and the interest that had accumulated on their accounts to date.  However, when it came time to repay certain lenders the principal and interest on their loans, LaPlante was repeatedly unable to deliver on her promise to do so.  At one point, LaPlante estimated she owed lenders a total of one million dollars.

## B.  The Trial

LaPlante was indicted in March 2009 on one count of mail fraud in violation of 18 U.S.C. § 1341.  She was charged with devising a scheme and artifice to defraud and to obtain money by means of false and fraudulent pretenses, representations and promises, by allegedly lying to lenders about her ability to repay the loans and about the fact that the loans would be used for her factoring business.

Trial began on February 15, 2011. As indicated by opening statements, the defense's main theory was that LaPlante did not intend to deceive any of the individual lenders.  According to the defense, the lenders should have known by looking at the loan agreements they signed that their loans were not being used solely for the factoring side of the business, but for the consolidated business which included marketing and consulting services.

The government's case-in-chief told a starkly different story.  The government's theory was that LaPlante knew her business had stopped actively factoring by January 2003, but she continued to seek and borrow money from individuals on the false representation that the money would be used for factoring.  The government theorized that LaPlante was not using that money for factoring, but instead was using the money to repay other loan debts she owed.

To support its theory, the government presented evidence primarily through the testimony of a Federal Bureau of Investigation ("FBI") forensic accountant and Attorney James Normand, who represented a victim lender in a civil suit against LaPlante, that LaPlante's company was not factoring during the relevant time period. The FBI accountant testified that she had reviewed JRL's financial records and concluded that only a few transactions related to factoring were executed after January 2003. Without going into detail about the complaint's allegations in the civil case, Attorney Normand testified on direct that the documentation LaPlante produced in connection with that case showed that JRL had not purchased any accounts receivable after January 2003. The government also introduced into evidence a taped interview of LaPlante by the New Hampshire Attorney General's Office, during which she admitted JRL was not engaged in factoring activities after January 2003.

Through the testimony of more than twelve individuals from whom LaPlante had borrowed money between January 2003 and February 2007, the government put forth evidence that LaPlante, as the sole person in charge of her business, lied to lenders about the viability of her business and lied that her company was actively engaged in factoring at the time. A number of witnesses testified that, from their conversations with LaPlante, they believed she sought loans from them for factoring specifically.

After the conclusion of the evidence and closing statements, the district court delivered its jury charge (more on the jury instructions to come). The jury returned a guilty verdict the same day. LaPlante was later sentenced to 46 months' imprisonment with three years of supervised release and ordered to make restitution in the amount of $881,662.57. She timely appealed.

## DISCUSSION

### A.  Jury Instructions

On appeal, LaPlante argues two jury instruction related errors occurred below. Because, as LaPlante concedes, she failed to object to the jury instructions at trial, we review for plain error. United States v. Riccio, 529 F.3d 40, 46 (1st Cir. 2008). To establish plain error, a defendant must show that (1) an error occurred, (2) the error was obvious, (3) the error affected substantial rights, and (4) the error "seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Vargas-De Jesús, 618 F.3d 59, 67 (1st Cir. 2010) (internal quotation marks and citation omitted). LaPlante cannot satisfy the first prong of this test. Thus, our analysis starts and ends with that prong.

Title 18 United States Code Section 1341 provides in relevant

part:

-6-

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier . . . shall be fined under this title or imprisoned not more than 20 years, or both."

18 U.S.C. § 1341. In charging the jury, the district court described the elements of mail fraud and explained that the jury's decision had to be unanimous as to whether the government had proven those elements. The district court instructed that mail fraud consists of three elements the government must prove beyond a reasonable doubt: (1) a scheme or artifice to defraud; (2) the defendant's knowing and willing participation in the scheme to defraud with the specific intent to defraud; and (3) the use of the mails in furtherance of the scheme. As to the first element, the district court explained that a scheme to defraud is "a plan to deprive another of money or property by trick, deceit, deception or swindle" and that the scheme must relate to a "material fact or matter." The district court described a "material fact" as one that "has a natural tendency to influence or is capable of influencing the decision of the person to which it was addressed" and instructed the jury that if it were to "find a particular statement of fact was false, you must then determine whether that statement was one that a reasonable person [would] h[a]ve

-7-

considered important in making his or her decision.  The same principle applies to fraudulent half-truths or omissions of material facts."

With respect to the second element, the court defined "knowingly" as "act[ing] voluntarily and deliberately, rather than mistakenly or inadvertently" and "willfully" as "act[ing] knowingly and purposefully with an intent to do something the law forbids[.]"  The jury was instructed that "intent to defraud means to act willfully with a specific intent to deceive or cheat or for the purpose of either causing some financial loss to another or bringing about some financial gain to oneself."  The court further instructed that the question of whether the "defendant acted knowingly, willfully and with the intent to defraud is a question of fact for [the jury] to resolve" and goes to the "defendant's state of mind."  Direct proof of intent, the court explained, is not required; intent may be "established by circumstantial evidence."

Moving on to the third element, the court instructed the jury that the government had to prove the use of the mails in furtherance of the scheme to defraud, which means the mails must further or assist in carrying out the scheme.  The court made clear that the burden to prove all of the elements rested with the government.

LaPlante first argues the district court erred when it instructed the jury on the elements of a scheme to defraud rather than on the elements of a scheme to obtain money or property by false or fraudulent pretenses, representations or promises. Specifically, LaPlante argues that a scheme to obtain money by false pretenses includes proof of a false statement, whereas a scheme to defraud does not involve such proof. She says that because the government's evidence at trial focused on the false statements LaPlante made to lenders, the heart of the government's case focused on a scheme to obtain money or property by false or fraudulent pretenses, representations or promises, not a scheme to defraud. LaPlante contends that as a result, the district court should have "conform[ed]" its jury instructions to the government's evidence of false statements at trial by instructing the jury on the elements of a scheme to obtain, and that failing to do so constituted error. We find no error, plain or otherwise.

The crux of LaPlante's argument is based on the fundamentally flawed premise that a scheme to defraud cannot be proven using false statements. Enacted in 1872, the original mail fraud statute prohibited the use of mails to further "[a]ny scheme or artifice to defraud." Durland v. United States, 161 U.S. 306, 313 (1896) (internal quotation marks omitted). The statute's language did not include the words "or for obtaining money or property by means of false or fraudulent pretenses,

representations, or promises," as it does today. The Supreme Court early on rejected a narrow interpretation of the phrase "any scheme or artifice to defraud" that would have confined the statute's reach to "such cases as, at common law, would come within the definition of 'false pretenses,'" such as cases involving an actual misrepresentation of a material fact. Id. at 312. Rather, Durland broadly interpreted the words "scheme to defraud" to "include[] everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future." Id. at 313.

Codifying the holding in Durland, Congress amended the mail fraud statute in 1909, giving "further indication that the statute's purpose is protecting property rights." McNally v. United States, 483 U.S. 350, 357 (1987) (superseded on other grounds). "The amendment added the words 'or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises' after the original phrase 'any scheme or artifice to defraud.'" Id. (quoting Act of Mar. 4, 1909, ch. 321, § 215, 35 Stat. 1130). The added language, the Supreme Court has said, is based on the statement in Durland that the statute is intended to reach "everything designed to defraud." McNally, 483 U.S. at 357-58. Instead of using that phrase, however, Congress chose "'[any scheme or artifice] for obtaining money or property.'" Id. at 358. The meaning of the words "to defraud" -- which "refer

to 'wronging one in his property rights by dishonest methods or schemes' and 'usually signify the deprivation of something of value by trick, deceit, chicane or overreaching'" -- did not change after the 1909 amendment. Id. (quoting Hammerschmidt v. United States, 265 U.S. 182, 188 (1924)). The "obtaining money or property by means of false or fraudulent pretenses" language "simply made it unmistakable that the [mail fraud] statute reached false promises and misrepresentations as to the future as well as other frauds involving money or property." McNally, 483 U.S. at 359.

Thus, as was the case before the scheme-to-obtain language was added in 1909, a scheme to defraud captures within its ambit false representations. See, e.g., Durland, 161 U.S. at 312-13; McNally, 483 U.S. at 356-59. Indeed, as we have said, a scheme to defraud includes "'any plan, pattern or cause of action, including false and fraudulent pretenses and misrepresentations'"; that is, the government may, but is not required to, prove a scheme to defraud using evidence of false misrepresentations. United States v. Brandon, 17 F.3d 409, 424 (1st Cir. 1994) (quoting United States v. Goldblatt, 813 F.2d 619, 624 (3d Cir. 1987)) (defining the terms "scheme" and "artifice" used in connection with the bank fraud statute, 18 U.S.C. § 1344); see also United States v. Daniel, 329 F.3d 480, 485 (6th Cir. 2003) (holding a "scheme to defraud includes any plan or course of action by which someone intends to deprive another by deception of money . . . or property by means of

-11-

false or fraudulent pretenses, representations, or promises")
(internal quotation marks and citation omitted).[1]  We have not
distinguished a scheme to defraud from obtaining money or property
by false or fraudulent pretenses in the restrictive manner
suggested by LaPlante.  We have instead taken the broader approach,
consistent with Supreme Court precedent, that the government may
secure a mail fraud conviction by "prov[ing] the existence of a
scheme conceived for the purpose of defrauding by means of false
pretenses, representations or promises" and the "use of the United
States mails in furtherance of that scheme."  United States v.
Serrano, 870 F.2d 1, 6 (1st Cir. 1989) (internal quotation marks,
alterations, and citation omitted).

     The government's evidence in this case that LaPlante lied
to lenders about the viability of her business and lied that JRL
was actively factoring during the relevant time period sought to
prove mail fraud and specifically, a scheme to defraud.  The use of
false misrepresentations as evidence against her does not, as
LaPlante says, automatically mean a "scheme to obtain" was the only

---

[1]LaPlante cites United States v. Goldberg, 913 F. Supp. 629,
636-37 (D. Mass. 1996), for the proposition that a conviction for
a scheme to obtain, unlike a scheme to defraud, involves proof of
a particular false statement.  Goldberg does not stand for that
proposition.  While Goldberg notes that "a conviction for a scheme
to defraud does not require proof of any false statement, which is
the sine qua non of the second provision," id. at 637, it draws
from Supreme Court precedent and First Circuit case law to
ultimately conclude that the words "scheme to defraud" may not
require proof of false promises, but they certainly encompass such
promises.  Id. at 637-38.

provision of the mail fraud statute under which the district court could have appropriately instructed the jury.[2]  Accordingly, the district court more than adequately instructed the jury on the necessary elements of a scheme to defraud and we find no error, plain or otherwise, with its instructions.

LaPlante next contends that even if the district court correctly focused its jury instructions on a scheme to defraud, the district court erred in failing to give a specific unanimity instruction on which particular false statement alleged in the indictment was used to carry out the fraud.  We find no error.  The court was not required to give that unanimity instruction because the jury is not required to agree on the means -- the specific

---

[2]LaPlante mistakenly relies on Hebshie, 549 F.3d at 43-44, to support her argument that the district court erred in failing to instruct the jury on the elements of a scheme to obtain.  Hebshie concerned the district court's error in "conflating the 'causation' requirement with the 'in furtherance' requirement" when explaining the mail element of the mail fraud statute.  Id. at 42.  That is not this case.  LaPlante's reliance on United States v. Fontana, 948 F.2d 796, 801 (1st Cir. 1991), is similarly misplaced.  Fontana observed that fraudulent misrepresentations must be shown under the second prong of the bank fraud statute -- a scheme or artifice to obtain any of the moneys of a financial institution by means of false or fraudulent pretenses.  Id. at 801-802.  In rejecting defendant's argument that the jury charge imposed on the government the burden of proving fraudulent misrepresentation "under both prongs of § 1344," id. at 801, we noted the jury instruction reflected the existence of two disjunctive prongs of the statute, "only one of which [the scheme to obtain prong] by its plain language requires the showing of fraudulent misrepresentations." Id. at 802 (emphasis in original).  Fontana thus does not support LaPlante's argument that because a "scheme to obtain" requires proof of a false statement and a scheme to defraud does not, false statements cannot be used to prove a scheme to defraud.

-13-

false statement -- LaPlante used to carry out her fraudulent scheme. The requirement that a jury must come to a unanimous agreement "on the principal facts underlying its verdict--what courts have tended to call the elements of the offense . . . does not extend to subsidiary facts--what [the Supreme Court] has called 'brute facts.'" United States v. Lee, 317 F.3d 26, 36 (1st Cir. 2003); see also United States v. Reeder, 170 F.3d 93, 105 (1st Cir. 1999) (following Schad v. Arizona, 501 U.S. 624, 631 (1991)) (noting a jury must agree unanimously that the government has proven all the elements of the offense, but it "need not agree on the means by which all the elements were accomplished"). "[T]the Supreme Court has 'never suggested that in returning general verdicts in such cases the jurors should be required to agree on a single means of commission, any more than the indictments were required to specify one alone.'" United States v. Hernandez-Albino, 177 F.3d 33, 40 (1st Cir. 1999) (quoting Schad, 501 U.S. at 631) (finding no error in failure to give unanimity instruction on which gun the defendant carried in case involving a conviction for carrying a firearm during and in relation to a drug crime). A jury, faced with "divergent factual theories in support of the same ultimate issue," may decide unanimously, as is the case here, that the government has proven a scheme to defraud even if they may not be unanimous as to the precise manner in which it occurred. Lee, 317 F.3d at 36. On this we are not alone. See, e.g., United

-14-

States v. Rice, 699 F.3d 1043, 1048 (8th Cir. 2012) (holding a jury is not required to agree unanimously on the particular means the defendant used in each fraudulent wire transfer); United States v. Lyons, 472 F.3d 1055, 1068-69 & n.11 (9th Cir. 2007) (no plain error in failing to instruct jury that it must be unanimous regarding theory of fraud).

We therefore find no error, much less plain error, in the district court's failure to provide a unanimity instruction on which particular statement was false.[3]

---

[3]LaPlante makes a passing argument that the district court further erred because, in her view, the jury instructions allowed the jury to convict based on false statements not alleged in the indictment. She fails to present any developed argument to support her claim. LaPlante makes only a cursory reference to the court's instruction that if the jury were to "find a particular statement of fact was false" it then had to determine whether the statement was one that a reasonable person would have considered important in making his or her decision. Given the allegations made in the indictment, the evidence presented at trial and the jury instructions as a whole, we cannot see how the court's particular-statement instruction allowed the jury to convict on false statements not alleged in the indictment. In its instructions, the court repeatedly told the jury that the government had to prove beyond a reasonable doubt that there was a scheme or artifice to defraud as "charged" and "described" in the indictment. The indictment alleged five different ways LaPlante carried out her scheme -- i.e., by falsely informing victim lenders her company was actively purchasing accounts receivable and falsely telling lenders that their loans would be used by her company for that purpose, among other ways. And, at trial the government's evidence proved the allegations by presenting witness testimony about false statements LaPlante made to them about her business and what their money would be used for.

-15-

## B.  Ineffective Assistance of Counsel

As alluded to previously, at trial the government presented the testimony of Attorney Normand, counsel for the plaintiff in the civil case against LaPlante.  During cross-examination, defense counsel established through Attorney Normand that the civil case ended in a default judgment finding fraud against LaPlante and her business.  Defense counsel also moved into evidence the order itself, which said the default judgment, finding fraud on two counts, was based on the representation that no payments had been made to the plaintiff.  On appeal, LaPlante claims that introducing evidence of the default judgment to the jury botched her defense and amounted to ineffective assistance of counsel in violation of the Sixth Amendment of the United States Constitution, U.S. Const. Am. VI.

LaPlante never raised her ineffective assistance claim in the district court.  And we rarely review Sixth Amendment claims against trial counsel raised initially on direct appeal.  United States v. Mala, 7 F.3d 1058, 1063 (1st Cir. 1993).  A defendant waging a Sixth Amendment attack must show both that counsel's performance was constitutionally deficient, meaning that counsel made errors so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and that the deficient performance prejudiced the defense.  Strickland v. Washington, 466 U.S. 668, 687 (1984); see also United States v.

Natanel, 938 F.2d 302, 309 (1st Cir. 1991). An appellate court is typically ill-equipped to handle the fact-specific inquiry involved in deciding whether a defendant has made that showing. United States v. Ofray-Campos, 534 F.3d 1, 34 (1st Cir. 2008). That is because the record on appeal as to what happened and why counsel acted as he did is ordinarily not sufficiently developed to allow reasoned consideration of an ineffective assistance claim. United States v. Torres-Rosario, 447 F.3d 61, 64 (1st Cir. 2006). The trier, on the other hand, who presided over the trial and saw and heard each witness first hand, is in the best position to "marshal and evaluate evidentiary facts required to place the adequacy of the defendant's representation into proper perspective." Natanel, 938 F.2d at 309. A defendant is thus ordinarily required to present his ineffective assistance claim first to the district court in a petition under 28 U.S.C. § 2255. Ofray-Campos, 534 F.3d at 34.

In exceptional cases, however, where the record is sufficiently developed and the critical facts are undisputed, we may review an ineffective assistance claim on direct appeal. Id.; see Natanel, 938 F.3d at 309 (reviewing on direct appeal ineffective assistance claim). This is that rare case. We see no reason for further fact-finding, as urged by the government, given the robust record detailing what happened below, which makes clear why counsel pursued the strategy he did.

We narrow our focus, as LaPlante does, on the testimony of the government's witness, Attorney Normand. At trial, the government elicited testimony from Attorney Normand about the documentation LaPlante produced in his client's civil case against her and JRL to demonstrate JRL had not engaged in factoring after January 2003. The government did not question Attorney Normand on the specific allegations made in that lawsuit, and LaPlante's trial counsel did not object to his testimony. On cross-examination, however, defense counsel elicited testimony that the state court complaint included allegations of fraud and negligent misrepresentation.

The district judge interrupted defense counsel as he questioned Attorney Normand further about the complaint's allegations. At sidebar, the district judge asked defense counsel what he "was trying to do and why?" Defense counsel explained he wanted to show that the finding of fraud in the state civil case was based on a default judgment, and that contrary to the statement in the default judgment order that undisputed evidence showed no payments were made to repay the plaintiff, payments were in fact made. He said the testimony about the complaint and the default judgment would help him show that the dissemination of the default judgment to other victim lenders caused them to panic into believing they had been defrauded. This, he believed, would demonstrate the present case had nothing to do with LaPlante's

intent to defraud; it was all just one big misunderstanding by other lenders.

The district judge seemed concerned, asking defense counsel, "You yourself on behalf of the defendant are seeking to put before this jury that a civil judgment was entered finding your client engaged in fraud . . . [a]nd then you're going to attempt to explain that away later." Defense counsel responded by again explaining his theory that the lenders saw the default judgment, jumped to the conclusion that LaPlante had defrauded them, and the situation "snowballed out of control" from that point forward. The district judge told counsel he could elicit testimony that payments were in fact made to the plaintiff in the state court case and that the finding of civil fraud was based on a default judgment.[4]

Cross-examination resumed and Attorney Normand testified that a default judgment had been issued in the civil fraud case and defense counsel admitted into evidence the order issuing the default judgment. Defense counsel asked Attorney Normand whether LaPlante had submitted payments to his client (the plaintiff in the civil fraud case) after, not before, the default judgment was entered. Attorney Normand responded in the affirmative and defense counsel proceeded to ask him about the elements of fraud. Once again, the district court stepped in and called counsel to sidebar.

---

[4]During defense counsel's direct examination of LaPlante, he questioned her about the default judgment order finding fraud.

The district judge asked counsel why he was questioning Attorney Normand on the elements of fraud. Counsel said he wanted to show the jury that the default judgment was the "unintended consequence" of unintentional misrepresentations made by plaintiff's counsel in the state case that LaPlante had failed to repay the plaintiff, when she had in fact made payments. He explained that the idea of unintended consequences applied because lenders, after learning about the default judgment, panicked and mistakenly believed they too had been defrauded, leading to a run on the bank and LaPlante's inability to pay anyone back. Defense counsel suggested again that such chain of events, not LaPlante's fraudulent intent, led to the government's prosecution of LaPlante. The district judge corrected counsel that up until that point in the trial, he had presented no evidence to support his theory that the default judgment was disseminated, panicked lenders, and caused them to believe LaPlante had defrauded them. The district judge also pointed out that the government's "mindset" for deciding to charge LaPlante with fraud was irrelevant. Counsel quickly switched gears and pressed that he was trying to establish through Attorney Normand the default judgment's possible effect on the individual lenders. The district judge rejected that idea too since Attorney Normand could not be asked to speculate about the default judgment's effect on other lenders; counsel's questions, the district judge said, were to be limited to asking Attorney

-20-

Normand about the judgment's effect on him only. The district judge also shot down defense counsel's argument that he be allowed to question Attorney Normand as a legal expert on the elements of fraud.

Despite the defense's theory that the dissemination of the default judgment led lenders to believe they had been defrauded, counsel did not establish through Attorney Normand's testimony (or anyone else's) that the default judgment in the civil fraud case had ever been disseminated to any lenders. Counsel also presented no evidence about the alleged misrepresentation concerning repayments he says caused the default judgment to be entered in the civil case.

In seeking to establish her ineffective assistance claim, LaPlante says she satisfies the first prong of the ineffective assistance test because her trial counsel's decision to use the default judgment the way he did was patently unreasonable.[5] See

_____

[5]The government urges us to hold off on deciding this issue. It argues that more fact-finding is necessary to understand the reasons counsel chose to put the default judgment at center stage before the jury. We find the record sufficiently clear as to why defense counsel wanted to elicit testimony concerning the default judgment. At the bench conference and sidebars during the cross-examination of Attorney Normand, counsel explained that bringing out testimony about the default judgment would help support his theory that the present case was merely a result of lenders who panicked after seeing the default judgment, believing they had been defrauded (which he somehow believed would negate LaPlante's intent to defraud). We do not see what more defense counsel could say to explain his actions to warrant further factual development. Cf. Ofray-Campos, 534 F.3d at 34 (finding record unclear as to whether defense counsel's decision to discuss that local charges were

-21-

United States v. Valerio, 676 F.3d 237, 246 (1st Cir. 2012). Although we have serious trouble seeing how admitting the default judgment finding fraud against LaPlante in a civil case brought by a victim lender could have advanced any legitimate defense strategy under the circumstances at the time, we need not ultimately decide whether doing so amounted to constitutionally deficient performance. Assuming without deciding that defense counsel's performance was professionally unreasonable, LaPlante cannot establish that prejudice resulted from it.

To demonstrate she was prejudiced by trial counsel's constitutionally deficient performance, LaPlante must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. The reviewing court "must consider the totality of the evidence before the judge or jury." Id. at 695. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Id. at 696.

While LaPlante contends she was prejudiced by the testimony concerning the default judgment and counsel's decision to

---

pending against his client for the murder of a rival drug dealer was a legitimate tactical decision at the time it was made or deficient performance in violation of the defendant's right to effective assistance).

admit into evidence the order of the default judgment, the evidence supporting the jury's verdict in this case was overwhelming. The government introduced evidence showing that between January 2003 and February 2007, lenders loaned money to LaPlante's business based on her representation that their money would be used for factoring in particular, not marketing or consulting, after she explained to them how factoring worked and how profitable it was. The government presented evidence that LaPlante lied to those lenders about the viability of her business and lied that JRL was actively factoring during the relevant time period. On cross-examination, LaPlante even admitted that she asked a particular lender for a loan so she could purchase accounts receivable and that after receiving the funds, she did not use them for that purpose. Given the weight of the evidence, LaPlante cannot demonstrate a reasonable probability that her trial's outcome would have been different but for defense counsel's missteps. Accordingly, she cannot prevail on her ineffective assistance claim.

## Conclusion

We need say no more. LaPlante's conviction stands. <u>Affirmed</u>.