# United States Court of Appeals
## For the First Circuit

No. 15-2345

UNITED STATES OF AMERICA,

Appellee,

v.

SANTOS GÓMEZ-ENCARNACIÓN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

Before

Lynch, Circuit Judge,
Souter, Associate Justice,[*]
and Kayatta, Circuit Judge.

Elaine Pourinski on brief for appellant.
Thomas F. Klumper, Assistant United States Attorney, Acting Chief, Appellate Division, and Rosa Emilia Rodríguez-Vélez, United States Attorney, on brief for appellee.

March 20, 2018

---

[*] Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**KAYATTA**, **Circuit Judge**.    In 2014, Defendant Santos Gómez-Encarnación was charged with both money laundering and conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956.  Tried, convicted on both counts, and sentenced to fifty-one months in prison, he now appeals both his conviction and his sentence.  For the following reasons, we affirm.

## I.

In 2014, the Drug Enforcement Administration ("DEA") began an investigation into potential bulk cash smuggling by Juan Polanco-Ventura ("Polanco").    On April 28, 2014, the DEA intercepted a call between Polanco and a co-conspirator, Daniel Pilier, during which Polanco told Pilier that he was going to Pilier's friend's house and Pilier told Polanco to pick up the money.  Shortly thereafter, Polanco called the defendant, Santos Gómez-Encarnación, and asked if he could come by.  An agent observed Polanco go to Gómez-Encarnación's residence, where Polanco received something through his car window from a person later identified by the agent as co-defendant Pedro Trinidad-Marine ("Trinidad").  Contemporaneously, Polanco called Pilier and informed him that he had picked up the money and would wire him some.  Polanco was seen shortly thereafter near a money transfer business, holding a piece of paper similar to a receipt.

The next month, agents intercepted several calls between Polanco and an associate outside the United States during which

- 2 -

the callers discussed the smuggling of currency to fund drug shipments. The month after that, agents began surveilling Gómez-Encarnación's residence, and on June 12, observed Trinidad pick up Gómez-Encarnación at his home. On June 26, after receiving intelligence that co-defendant Henry Carmona Reyes ("Carmona") was coming to San Juan, agents established surveillance on Carmona and observed him and Trinidad drive (with a few stops) to Gómez-Encarnación's residence, where agents observed the three men talking.

Agents also intercepted several phone calls between Pilier and Gómez-Encarnación. On one call, Pilier told Gómez-Encarnación that he needed "pigeon peas," which, an agent testified, was a code phrase referring to drugs. Subsequent calls used additional coded language referring to drug pricing. The conversations also revealed that Gómez-Encarnación had changed phone numbers, which, an agent would later testify at trial, is typical in a drug trafficking operation.

On August 28, DEA agents arrested Gómez-Encarnación at his residence. Gómez-Encarnación told agents about some currency in a dresser, but denied the presence of firearms or drugs. A search of the residence recovered marijuana, ketamine, approximately $65,000 cash, and weapons including a Glock 21 pistol that had been modified so as to be capable of firing in fully automatic mode.

In October 2014, Gómez-Encarnación was indicted for conspiring to conduct financial transactions involving the proceeds of specified unlawful activity, described in the indictment as "the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in controlled substances." The indictment also charged the underlying substantive crime of money laundering.

Gómez-Encarnación elected to go to trial. At trial, agents testified as to the facts described above and the wiretaps were introduced as evidence. Crucially, Polanco testified against Gómez-Encarnación, stating that Polanco had made arrangements to pick up $40,000 from Gómez-Encarnación, that Gómez-Encarnación "gave" it to him outside Gómez-Encarnación's residence, and that the money was derived from drug proceeds. Gómez-Encarnación was convicted by a jury of both money laundering and conspiracy to launder money. The district court denied his motion for acquittal under Federal Rule of Criminal Procedure 29.

At sentencing, the court imposed a six-level enhancement under U.S.S.G. § 2S1.1(b)(1) after finding that Gómez-Encarnación knew that the crime involved drug trafficking proceeds. In addition, the district court denied Gómez-Encarnación's request for a reduction under U.S.S.G. § 3B1.2(a) or (b) for having only a minor or minimal role in the offense. The district court imposed

a fifty-one month sentence. Gómez-Encarnación now appeals his conviction and sentence.

## II.

Gómez-Encarnación contends that the district court erred in: (1) denying his motion for acquittal on the basis that the evidence was insufficient to support a conviction, (2) imposing a six-level enhancement for the money laundering having involved the proceeds of drug trafficking, and (3) denying him a reduction based on his having a "minor or minimal" role in the offense. We take each contention in turn.

## A.

We review the denial of a Rule 29 motion for acquittal de novo. United States v. Acevedo, 882 F.3d 251, 258 (1st Cir. 2018). Under such a review, "we must affirm unless the evidence, viewed in the light most favorable to the government, could not have persuaded any trier of fact of the defendant's guilt beyond a reasonable doubt." Id.

Gómez-Encarnación's primary argument is that Polanco's claim that Gómez-Encarnación "gave" him the money rendered the gist of Polanco's testimony necessarily unreliable because the agent who observed the pick-up testified that Trinidad, not Gómez-Encarnación, was the one who physically went to Polanco's car to deliver the money. We do not see that potential inconsistency as sufficient to vacate the conviction. The wiretap, the

surveillance, and the agents' testimony directly corroborated Polanco's claim that he arranged to get the cash from Gómez-Encarnación at the place where Gómez-Encarnación resided. While Polanco's testimony that Gómez-Encarnación "gave" him the money, coupled with the agent's testimony that Trinidad physically delivered it to the car, invited fair argument that Polanco was not credible, such an argument fell far short of being so compelling that no reasonable jury could rely on Polanco's testimony in finding Gómez-Encarnación guilty beyond a reasonable doubt. There are many ways to "give" money to someone, including having an associate carry the cash from one's home to an individual whom one knows is waiting outside for the cash. The important point on which the agent and Polanco agreed was that Polanco received something outside Gómez-Encarnación's residence after the phone calls arranging the pick-up and before Polanco proceeded to the money transfer business.

Gómez-Encarnación's second argument in support of his challenge to the sufficiency of the evidence -- that no agent observed him do anything illegal -- carries even less force. There is simply no requirement that a government agent witness the charged criminal act.

Finally, Gómez-Encarnación's claim that it could not be known with any certainty that it was his voice on the wiretaps is simply a veiled request to view the evidence in his favor, rather

than in favor of the government as we are required to do at this stage. A government agent who interviewed Gómez-Encarnación for an hour after his arrest listened to the phone calls and identified Gómez-Encarnación's voice on the recordings. Testimony to that effect was enough to permit a jury to find that the voice belonged to Gómez-Encarnación.

In sum, with the wiretaps, the agents' observations, the items seized after Gómez-Encarnación's arrest, and the testimony of Polanco, there was sufficient evidence for a conviction, so we will not disturb the jury's verdict.

**B.**

Gómez-Encarnación also contests the application of a six-level enhancement pursuant to U.S.S.G. § 2S1.1(b)(1), which applies where "the defendant knew or believed that any of the laundered funds were the proceeds of, or were intended to promote . . . an offense involving the manufacture, importation, or distribution of a controlled substance." For a sentencing enhancement to apply, the district court must find it supported by a preponderance of the evidence. United States v. Lacouture, 835 F.3d 187, 189–90 (1st Cir. 2016). We review factual findings of a sentencing court for clear error, and will not reverse absent "a strong, unyielding belief that a mistake has been made." United States v. Torres-Velazquez, 480 F.3d 100, 103 (1st Cir. 2007).

Gómez-Encarnación was caught on wiretaps using drug-related code language. An agent also testified that Gómez-Encarnación's changing of cell phones was consistent with the habits of drug traffickers. Furthermore, though the district court sustained objections when Polanco testified that Gómez-Encarnación was in the drug business, it admitted Polanco's testimony that Polanco and several other co-conspirators were knowingly involved in drug trafficking. From this testimony, a factfinder might infer that another member of the conspiracy, Gómez-Encarnación, also knew that the money laundering involved drug proceeds. Considering cumulatively the testimony described above, we see no clear error in the application of this enhancement.

## c.

Finally, Gómez-Encarnación contends that the district court should have granted him a two- or four-level reduction for having a minor or minimal role in the offense, pursuant to U.S.S.G § 3B1.2(a) or (b). To qualify for this reduction, "the defendant must satisfy a two-pronged test. First, he must demonstrate that he is less culpable than most of those involved in the offense of conviction. Second, he must establish that he is less culpable than most of those who have perpetrated similar crimes." United States v. Mateo-Espejo, 426 F.3d 508, 512 (1st Cir. 2005) (internal citations omitted). Similar to the enhancement discussed supra, the preponderance of the evidence standard governs the court's

determination of whether a reduction is merited; however, the burden to establish the appropriateness of such a reduction falls on the defendant.  See United States v. Cortez-Vergara, 873 F.3d 390, 393 (1st Cir. 2017).  A district court's factual findings as to a defendant's role in the offense are reviewed for clear error.  See United States v. Melendez-Rivera, 782 F.3d 26, 28-29 (1st Cir. 2015).

Gómez-Encarnación cannot overcome the clear error hurdle.  As the government correctly points out, Gómez-Encarnación stored cash at his residence and used it as a pick-up point.  One hundred and five thousand dollars -- the sum of the money given to Polanco and found at Gómez-Encarnación's residence -- is enough to suggest that Gómez-Encarnación was well-trusted by the conspirators with responsibility not easily granted to a minor player in the conspiracy.  And he discussed cash transfers and drug supply over the phone with co-conspirators.  On this record, we cannot say that the district court clearly erred in denying his request for a minor or minimal participant reduction.

## III.

The evidence in this case was sufficient to support the conviction, the sentencing enhancement, and the denial of the minor or minimal role reduction.  We therefore affirm.