# United States Court of Appeals
## For the First Circuit

No. 17-1503

UNITED STATES OF AMERICA,

Appellee,

v.

ALBA PENA, a/k/a Alba Toribio,

Defendant, Appellant.

No. 17-1504

UNITED STATES OF AMERICA,

Appellee,

v.

INDRANIS ROCHEFORD,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Torruella, Selya and Barron,
Circuit Judges.

James L. Sultan, with whom Kerry A. Haberlin and Rankin
& Sultan were on brief, for appellant Pena.
Leonardo A. Angiulo for appellant Rocheford.

Randall E. Kromm, Assistant United States Attorney, with whom Andrew E. Lelling, United States Attorney, was on brief, for appellee.

_____

December 14, 2018

_____

**BARRON**, **Circuit Judge**.  Alba Pena ("Pena") and Indranis Rocheford ("Rocheford") are sisters, who in 2017 were each convicted of multiple counts of wire fraud in violation of 18 U.S.C. § 1343.  They had been charged with participating, along with their mother, Patria Zuniga ("Zuniga"), in a scheme to defraud immigrants by falsely promising them that Zuniga would, in return for payment, secure valid immigration status documents for them. We now reject the challenges to the convictions that each sister brings on appeal, as well as the challenge that Rocheford brings to her sentence.  We thus affirm the judgments below.

## I.

Zuniga, Pena, and Rocheford were each indicted, on July 16, 2015, in the United States District Court for the District of Massachusetts on various counts of wire fraud in violation of 18 U.S.C. § 1343.  That indictment charged Zuniga and the sisters with eight separate counts of wire fraud, based on a "[s]cheme to defraud" that, according to the superseding indictment, began in 2009 and extended through 2013.  The indictment also included a forfeiture allegation.

The indictment began by describing the alleged fraudulent scheme and the role that Zuniga and the sisters allegedly played in it.  Specifically, the indictment alleged that Zuniga and the two sisters "devised and intended to devise" the scheme in order "to defraud and for obtaining money . . . from .

. . the victim-immigrants . . . by causing and fraudulently inducing [them] to pay significant sums of money in exchange for immigration status documents which [Zuniga, Pena, and Rocheford] promised that Zuniga could secure on their behalf." The indictment further alleged that "[t]o accomplish this" fraud, Zuniga and the two sisters "falsely and fraudulently represented to the victim-immigrants that Zuniga worked for United States immigration authorities and could obtain legal immigration status documents for each immigrant-victim in exchange for payments ranging from $8,000 to $14,000." And, the indictment also alleged, "[i]n reliance" on these false and fraudulent representations, "the victim-immigrants made payments directly to [Zuniga, Pena, and Rocheford] or to parties specifically designated by" them "in various ways, including but not limited to, interstate bank deposits and interstate wire transfers."

The indictment then set forth the eight specific counts of wire fraud. Each count corresponded to a separate wire transfer or electronic bank deposit that allegedly had been made in furtherance of the scheme. In addition, each of those wire transactions was allegedly made, as payment for the fraudulent services, by one of the immigrant victims of the scheme either to Rocheford or to another person that the schemers had designated to receive the funds.

- 4 -

Zuniga pleaded guilty to the counts against her on January 28, 2016. The government then issued superseding indictments that set forth the same eight counts against Pena and Rocheford, who each then proceeded to trial. Their joint trial began on January 9, 2017.

At trial, the government introduced testimony from 20 immigrants who stated that they had been victims of the alleged fraudulent scheme. Six of them testified to making the wire transfers or bank deposits as payment for the fraudulent immigration services referenced in the indictment's eight counts. The District Court instructed the jury as to both principal and aiding and abetting liability as to all of the counts against the two sisters. The jury found Pena guilty of all but one of the counts against her and Rocheford guilty of all but three of the counts against her. Pena and her sister moved under Rule 29 of the Federal Rules of Criminal Procedure for a judgment of acquittal, but their motions were denied.

At sentencing, the District Court sentenced Pena to 35 months in prison and three years of supervised release. The District Court sentenced Rocheford to 33 months in prison and three years of supervised release. Each sister was required to pay $739,850 in restitution.

We turn first to Rocheford's sufficiency challenge, in which she seeks to overturn all five of her convictions. In order to prove that a defendant has committed wire fraud in violation of 18 U.S.C. § 1343, the government must prove the following: "(1) a scheme or artifice to defraud using false or fraudulent pretenses; (2) the defendant's knowing and willing participation in the scheme or artifice with the intent to defraud; and (3) the use of the interstate wires in furtherance of the scheme." United States v. Appolon, 715 F.3d 362, 367 (1st Cir. 2013).

Our review of the denial of Rocheford's Rule 29 motion is de novo. United States v. Gómez-Encarnación, 885 F.3d 52, 55 (1st Cir. 2018). "Under such a review, 'we must affirm unless the evidence, viewed in the light most favorable to the government, could not have persuaded any trier of fact of the defendant's guilt beyond a reasonable doubt.'" Id. (quoting United States v. Acevedo, 882 F.3d 251, 258 (1st Cir. 2018)).

Rocheford does not dispute that the evidence sufficed to show the existence of the fraudulent scheme described in the indictment, which alleged a wide-ranging effort to cheat immigrants by obtaining payments from them in return for the immigration services that Zuniga falsely and fraudulently promised them. Rocheford also does not dispute that the evidence sufficed to show that the wire transfers and bank deposits referenced in

the counts underlying the convictions at issue were made by victims of the scheme as payment for the fraudulent services. Thus, she does not challenge that the wire transfers were made in furtherance of that scheme or even that it was foreseeable that such transactions would occur in the scheme's "ordinary course." United States v. Vázquez-Botet, 532 F.3d 37, 64 (1st Cir. 2008) (citing United States v. Benmuhar, 658 F.2d 14, 16-17 (1st Cir. 1981)).

Rocheford focuses instead on the second of the elements of the offense that we have just described. She contends that the government failed to meet its burden to prove that she was a knowing and willful participant in the fraudulent scheme alleged in each count. Specifically, Rocheford contends that, based on the evidence, "[a]t most, the jury could have found only that Rocheford allowed Zuniga to use her bank account, and that Rocheford thought that Zuniga had some ability to help people resolve immigration issues." But, we do not agree.

The government introduced evidence that showed that Rocheford helped her mother recruit new immigrants to obtain the promised immigration services in return for payment, assisted with administrative tasks like filling out the immigrants' applications for the status documents, and sometimes directly received payment from immigrants for the promised services either in person or via electronic transfer. In fact, the government introduced evidence that supportably showed that Rocheford had facilitated payments

- 7 -

for her mother's services from two people who testified not only to being victims of the scheme, but also to having made the specific wire transfers and bank deposits that are referenced in three of the five counts at issue. The government also introduced evidence, referenced in the remaining counts under review, that another person who had been a victim of the alleged fraudulent scheme also made a bank deposit directly into Rocheford's bank account in furtherance of that scheme.

Thus, the evidence amply showed that Rocheford was an active participant in the scheme as a whole, received bank deposits from all three victims named in the counts against her, and even had a hand in facilitating the payments from two of those three named victims. And Rocheford does not contest that the evidence sufficed to show that the scheme was in fact fraudulent.

Against that background, Rocheford's contention that the evidence did not suffice to show that she knew that her mother's promises about the services that she could provide were false and fraudulent is unpersuasive. We are obliged to consider the evidence in the light most favorable to the verdicts. See United States v. DiRosa, 761 F.3d 144, 150 (1st Cir. 2014). And, from that vantage point, we conclude that the evidence plainly sufficed to permit the jury to infer that Rocheford, given her close ties to her mother and her broader involvement in the fraudulent scheme, was a knowing and willful participant in the scheme to defraud

alleged in the counts underlying the convictions that she challenges. See id. at 151-52 (holding that, even where there was no evidence that the defendant did any of the "heavy lifting" of directly defrauding the victim, a jury could reasonably infer active participation in a wire fraud scheme, in part, from the defendant's proximity to the fraud and the fact that his wife's bank account received proceeds from the fraud); United States v. Ritz, 548 F.2d 510, 522 (5th Cir. 1977) ("The fact of the close association of the several parties and their association with Robert, Sr. the father who was the source of four of the bills is, one circumstance from which the jury might infer knowledge."). In fact, the record supportably shows that Rocheford, in the course of assisting her mother in carrying out the scheme, spent the funds given to her by victims on personal expenses after telling the victims that the money was being used to pay for their immigration papers, and obfuscated when victims became suspicious of Zuniga's actions. And Rocheford does not dispute that, if the jury was entitled to reject her contention that her involvement in the scheme was undertaken in good faith, then the convictions that she challenges rested on sufficient evidence.

Pena, for her part, challenges the sufficiency of the evidence as to only five of the seven counts of which she was convicted. But we see no merit in her challenge either.

The government introduced ample evidence to show that Pena was a knowing and willful participant in what the indictment described as -- and the evidence at trial revealed to be -- a wide-ranging scheme to lure numerous immigrants into paying for immigration services that Zuniga falsely and fraudulently promised to provide them. In fact, Pena does not challenge her convictions on two of the counts alleging her participation in that scheme.

To be sure, those counts reference wire transactions that were made by immigrants other than the immigrants involved in the counts underlying the convictions that she now challenges on appeal. And, Pena contends, that fact is significant because the government failed to prove any tie between her and the three immigrant-victims who testified about the particular transfers and deposits that are referenced in those counts.

Pena contends for that reason that convictions on those counts cannot be sustained. But, we do not agree. Pena is right that the record fails to show that she directly assisted her mother in luring those particular victims to pay for fraudulent immigration services or that she otherwise had any direct contact with them. In fact, the evidence does not even show that funds from those victims were directly deposited or transferred into Pena's account by those victims. The evidence sufficed to show only that, initially, Rocheford received those victims' funds and that, subsequently, she transferred a portion of those funds into

- 10 -

Pena's bank account.  But, while Pena contends that, "the possible transfer of ill-gotten gains" from her sister's account into her own was not enough "to prove that Pena participated or assisted in defrauding any of these three individuals," the government's case against Pena as to the convictions at issue does not depend simply on her receipt of "ill-gotten gains" standing alone.

The government put forth evidence of Pena's and Rocheford's knowing and willful participation in the broader fraudulent scheme to defraud numerous immigrants, as well as evidence that the three immigrants who made the transfers and bank deposits referenced in the counts underlying the convictions at issue were victims of that broader scheme.  In addition, the government put forth evidence that showed that Rocheford transferred funds to Pena just days after she had received funds from those victims.  And, the evidence also showed, the funds that Rocheford transferred to Pena were in amounts that a jury could reasonably find indicated that Rocheford was transferring to her sister funds that the victims had paid to her in return for the false and fraudulently promised immigration services.  Notably, Pena provides no explanation for why Rocheford otherwise would have transferred these funds to her bank account were it not for Pena's involvement in the fraudulent scheme.

Therefore, when the evidence is considered in the light most favorable to the verdicts, a jury could reasonably find that

Rocheford was transferring funds from these three victims to Pena due to Pena's role as a participant in the scheme to defraud those victims as part and parcel of the broader scheme, rather than out of sisterly affection. And, when considered in that same verdict-friendly light, a jury could also supportably find that Pena knew that she was receiving those funds from Rocheford in consequence of her participation in that same broader scheme. See DiRosa, 761 F.3d at 150; Ritz, 548 F.2d at 522.

As a result, the evidence was sufficient to sustain the convictions. We have made clear, after all, that there is no requirement under § 1343 that a defendant know the actual identities of the victims of the fraudulent scheme for there to be sufficient evidence that the defendant knowingly and willfully participated in perpetrating the scheme. See United States v. Tum, 707 F.3d 68, 75 (1st Cir. 2013). And, similarly, there is no requirement that a defendant actively participate in defrauding a particular victim of a broader scheme to defraud numerous victims if the evidence otherwise suffices to show that the defendant actively participated in the formulation and carrying out of that same scheme. See United States v. Appolon, 695 F.3d 44, 59 (1st Cir. 2012) (affirming multiple counts of wire fraud where, as here, the defendant did not directly participate in the fraudulent acts underlying those specific counts, but nonetheless received

payments as a result of those frauds and actively participated in the broader fraudulent scheme).

### III.

We turn, then, to Pena's fallback contention, in which she argues that the District Court erred by not allowing her to testify as to statements made by Zuniga that were aimed at demonstrating Pena's state of mind and thus that her convictions must be vacated because she was prejudiced in her ability to mount a "good faith" defense to the wire fraud charges. We see no merit to this contention either.

Pena challenges the District Court's decision to sustain the government's objections to her attempts to introduce testimony concerning four types of conversations between herself and Zuniga. She describes this testimony as having involved: conversations between Pena and Zuniga about one of the victims, Isabel Morales; conversations between Pena and Zuniga regarding Pena's familiarity with Zuniga's purported boss, Mr. Williams; conversations between Pena and Zuniga regarding "the source of the money in their shared bank account"; and confrontations between Pena and Zuniga regarding Pena's suspicions about Zuniga's fraud.

The parties dispute whether Pena properly preserved below the challenges that she now makes on appeal to the District Court's evidentiary rulings concerning this testimony. The government, relying on the "bedrock rule of trial practice that,

- 13 -

to preserve for appellate review a claim of error premised on the exclusion of evidence, the aggrieved party must ensure that the record sufficiently reflects the content of the proposed evidence," Williams v. Drake, 146 F.3d 44, 49 (1st Cir. 1998), contends that she has not preserved them. Accordingly, the government contends that, insofar as the challenges are not waived, they are forfeited and thus our review of them is only for plain error. Pena responds that she has properly preserved these challenges because the "thrust" of the testimony that she contends was improperly excluded is "obvious" from the record, and so there is no waiver or forfeiture.

We may assume, favorably to Pena, that our review is for abuse of discretion rather than for plain error. We may assume, too, that, as Pena contends, the testimony that she was barred from giving was excluded in consequence of erroneous evidentiary rulings by the District Court. For, even with those assumptions in place, we still see no basis for concluding that the convictions must be vacated, as Pena has not shown that she was prejudiced by the erroneous evidentiary rulings that she claims that the District Court made. See United States v. Sabean, 885 F.3d 27, 41 (1st Cir. 2018) (noting that under the harmless error standard, "[w]hen . . . an alleged error is not of constitutional dimension, we may affirm a conviction so long as we have 'fair assurance . . . that the judgment was not substantially swayed by the error'" (quoting

United States v. Melvin, 730 F.3d 29, 39 (1st Cir. 2013))); cf. United States v. Padilla, 415 F.3d 211, 220-21 (1st Cir. 2005) (noting that, under the plain error test, the error's prejudicial effect on the proceeding must have been "substantial and injurious").

We start with Pena's challenge to what she contends was the District Court's error in preventing her from testifying about what she describes as "conversations between Pena and Zuniga about Isabel Morales." Pena contends that this testimony was potentially significant because it would support her "good faith" defense by showing that she thought her mother was actually trying to help Morales and her son obtain immigration status documents.

We may assume, as Pena contends, that the District Court permitted her to testify only about the "topic" of the conversation and not about "what was said." And we may assume that such a ruling was in error. But still, the record shows that, with respect to her conversation with her mother about Morales, Pena did testify that she genuinely believed in consequence of that conversation that her mother could help Morales and Morales's son because she "was really knowledgeable [about] the immigration process." Thus, Pena was able to testify that she sincerely believed her mother was trying to help Morales's family when her mother met with her.

- 15 -

To the extent that Pena has in mind some additional testimony that she would have provided if the District Court had ruled other than it did, moreover, it is not the least bit obvious what that testimony would be.  All we know from her defense counsel's colloquy with the District Court is that she wanted to testify about "why [Morales] came to her house, or her understanding and her state of mind of why she took the action that she did."  Yet, Pena did not provide a proffer describing the substance of that testimony below.  We are thus left with no means of discerning prejudice.  See United States v. Rivera Rangel, 466 F.3d 158, 163 n.3 (1st Cir. 2006) (noting that the Court could not "credit [the appellant's] speculation" that they were harmed by the exclusion of evidence without an offer of proof).

Second, Pena contends that the District Court committed reversible error in precluding her from testifying about whether "she had heard of Mr. Williams, one of Zuniga's purported big immigration bosses."  Pena appears to contend that this testimony would have been significant because it would have showed that she believed that her mother was employed by a reputable immigration service provider.

But, again, Pena has not shown any prejudice, even assuming that she could show that the District Court erred with respect to this aspect of the testimony.  In particular, the record shows that, on direct examination, Pena was permitted to testify

that she learned about Mr. Williams as a small child. Moreover, soon after Pena gave that testimony, she testified, in response to questions from her defense counsel, both that she thought that her mother was getting paid by Mr. Williams and that her mother had received payment from him in exchange for immigration services. As Pena does not identify what additional testimony pertaining to whether "she had heard of Mr. Williams, one of Zuniga's purported big immigration bosses," that she was barred from giving, let alone how the alleged bar would have been prejudicial after accounting for the testimony about Mr. Williams that Pena was able to provide, we again see no basis for vacating the convictions.

Pena's third set of challenges to the District Court's allegedly wrongful exclusion of her testimony concern what she describes as "Pena's questions to Zuniga about the source of the money in their shared bank account and Zuniga's responses to those questions." But, this set of challenges runs into the same obstacles as the challenges previously addressed.

The record shows that Pena was permitted to testify that she did not know where Zuniga's money came from and that she did not believe that the money came from Zuniga's immigration clients. As Pena did not provide any proffer below about what additional testimony she would have provided in connection with this line of questioning if she had been permitted to respond more fully, we do

not see on what basis we could find prejudice sufficient to vacate the convictions.

Finally, Pena challenges what she contends was the wrongful exclusion by the District Court of what she describes as "testimony about the substance of Pena's [confrontation with] Zuniga when she became suspicious." But, once again, she cannot show prejudice.

In particular, the record shows that Pena was able to testify that, during her confrontations with Zuniga, her mother was "angry," "didn't like to be confronted," "yell[ed]," reminded Pena how much she had been there for her, and told Pena that she "cannot distrust her." As Pena provided no indication below -- and provides none on appeal -- of what more information she would have shared that would have materially advanced her "good faith" defense beyond what is already in the record, this challenge also fails, even if reviewed only for abuse of discretion.[1]

---

[1] On appeal, Pena for the first time also frames her challenge to the District Court's evidentiary rulings in federal constitutional terms. She points out that, under the Fifth and Sixth Amendments of the United States Constitution, a defendant is entitled to a "meaningful opportunity to present complete defense" to allegations of guilt. Crane v. Kentucky, 476 U.S. 683, 690 (1986) (quoting California v. Trombetta, 467 U.S. 479, 484 (1984)). Pena argues that, because the District Court sustained the government's hearsay objections and excluded this testimony, she was unable to establish that she participated in Zuniga's wire fraud scheme in "good faith," which would have provided a complete defense to liability for this crime. See United States v. Dockray, 943 F.2d 152, 155 (1st Cir. 1991). She thus contends that the

- 18 -

Because we do not find any merit in Pena's contention that the District Court committed reversible error by excluding the testimony that she identifies, we must also reject Rocheford's follow-on challenge, in which she contends that we must vacate her convictions insofar as we find that Pena's must be vacated due to the District Court's rulings as to that same testimony. We thus turn to the next issue, which concerns a challenge that only Rocheford brings.

**IV.**

Rocheford contends that her convictions should be vacated because the District Court erred in failing to give a particular instruction concerning unanimity. We disagree.

At trial, just prior to instructing the jury on the specific elements of wire fraud and of aiding and abetting, the District Court instructed the jury that it had to "separately consider the evidence against each defendant on each offense

---

government must show that any errors by the District Court in excluding testimony were harmless beyond a reasonable doubt. See United States v. Mulinelli-Navas, 111 F.3d 983, 992 (1st Cir. 1997). But, because Pena did not raise any constitutional objections at trial, these claims were not properly preserved. Our review is thus only for plain error. United States v. Cianci, 378 F.3d 71, 107 (1st Cir. 2004). And she cannot meet her burden to show prejudice under that demanding standard for the same reasons that we set forth in explaining that she has not shown prejudice sufficient to meet the ordinary prejudice standard that we apply in reviewing for abuse of discretion non-constitutional challenges to evidentiary rulings of the sort that are at issue here.

charged" and that its "decision on any one defendant on any one offense, whether guilty or not guilty, should not influence [its] decision on any other defendant or offenses," as "[e]ach defendant and each offense should be considered separate." The District Court then instructed the jury that it had to be unanimous in deciding to convict or acquit on a given count.

While deliberating, the jury had several questions for the judge. One of them was: "Does each defendant need to be directly involved in each count?" After that question, Rocheford requested that the District Court instruct the jury that "whatever they agree on, they all need to agree for a Defendant per each count." The District Court declined to provide that instruction, but did reinstruct the jury on the elements of wire fraud and aiding and abetting.

The jury also asked: "Is it required for each defendant to have direct involvement on each charge individually, or is knowledge of the greater scheme enough?" After that question, Rocheford "renewed [her] request for the separate unanimity instruction." The District Court again declined to provide the requested unanimity instruction, further instructed the jury that "[d]irect involvement is not a legal term that is in play in this case," and again asked the jury to "re-visit the elements" of the charged offenses.

"The standard of review for claims of instructional error is not monolithic." United States v. De La Cruz, 835 F.3d 1, 12 (1st Cir. 2016). Where an instructional error claim turns on a question of legal sufficiency, such as whether the District Court failed to give an instruction that was required by law, our review of the District Court's refusal to give the requested instruction is de novo. Id. However, where an instructional error claim turns on the District Court's phrasing or word choice, our Court reviews that decision only for abuse of discretion. Id. Given that Rocheford's claim addresses the District Court's failure to provide what, according to her, was a required unanimity instruction, de novo review is appropriate in this instance. See United States v. Lee, 317 F.3d 26, 35 (1st Cir. 2003). In addition, our Court will only require a new trial where we find that an instructional error was prejudicial. See Tatro v. Kervin, 41 F.3d 9, 14 (1st Cir. 1994).

It is not clear from the face of the requested instruction in this case -- which would have told the jurors that "whatever they agree on, they all need to agree for a Defendant per each count" -- what more it would have added to the unanimity instructions that were given that would have benefited Rocheford. And, if the rejection of the requested instruction was not prejudicial, then it was not reversible error for the District Court to refuse to give it. See id.

At oral argument on appeal, Rocheford's counsel did attempt to argue that the unanimity instruction that she requested would have added something. Specifically, she contended that it would have instructed the jury that each juror had to agree that Rocheford did "X" -- with "X" being the specific act(s) or occurrence(s) the jurors all agree provided the basis for finding each element of an offense of conviction was present -- on a specific date.

But, Rocheford's challenge to the District Court's refusal to give the instruction cannot be premised on that basis. The Supreme Court "has 'never suggested that in returning general verdicts'" in a wire fraud case such a Rocheford's that "the jurors should be required to agree on as single means of commission, any more than the indictments were required to specify one alone." United States v. LaPlante, 714 F.3d 641, 647 (1st Cir. 2013) (quoting United States v. Hernandez-Albino, 177 F.3d 33, 40 (1st Cir. 1999)). After all, "[t]he requirement that a jury must come to a unanimous agreement 'on the principal facts underlying its verdict -- what courts have tended to call the elements of the offense . . . does not extend to subsidiary facts —- what [the Supreme Court] has called brute facts.'" LaPlante, 714 F.3d at 647 (alteration in original) (quoting Lee, 317 F.3d at 36); see also United States v. Reeder, 170 F.3d 93, 105 (1st Cir. 1999) (following Schad v. Arizona, 501 U.S. 624, 631 (1991)) (noting a

jury must agree unanimously that the government has proven all the elements of the offense, but it "need not agree on the means by which all the elements were accomplished").[2]

**V.**

There remains, then, only Rocheford's challenge to her sentence. She argues that the District Court erred in finding the $739,852 loss amount used to support the application of a 14-level sentencing enchantment under the United States Sentencing Guidelines for a loss of more than $550,000 and less than $1,500,000, pursuant to U.S.S.G. § 2B1.1(b)(1)(H)-(I), and a restitution order, pursuant to U.S.S.G. § 5E1.1(a)(1) and the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. §§ 3663A, 3664.

This loss amount, set forth in the Pre-Sentencing Report ("PSR"), was comprised of the total loss to 57 victims who paid Pena, Rocheford and Zuniga as part of the scheme. On appeal, Rocheford argues that the proper amount for sentencing and restitution purposes is $17,534, which equals the losses solely associated with the counts for which she was convicted.

---

[2] We also agree with the government that Rocheford's reliance on United States v. Newell, 658 F.3d 1, 23 (1st Cir. 2011), is misplaced, as the duplicity issues present there -- i.e., the consolidation of multiple complete offenses under single counts -- are not present in Rocheford's case.

We review preserved objections to a district court's interpretation and application of the sentencing guidelines de novo and its factual findings for clear error. United States v. Curran, 525 F.3d 74, 78 (1st Cir. 2008). The government contends that Rocheford's arguments were not preserved below and should be reviewed for plain error only. But, even assuming that the issue was preserved, Rocheford's argument should fail.

Rocheford presses two arguments for why the $739,852 loss amount is incorrect. First, she argues that the loss attributable to her must be limited to "the sum of the amounts listed in the counts Rocheford was convicted for" because "Rocheford was not convicted as a co-conspirator of Zuniga." But, as the government points out, our precedent supports the conclusion that a restitution amount or sentencing enhancement, in the case of jointly undertaken criminal activity, may be based on "the amount of loss attributable to, or reasonably foreseeable by, a defendant, and may not rely solely on what was charged in the jointly undertaken criminal activity count of an indictment." United States v. Codarcea, 505 F.3d 68, 72 (1st Cir. 2007) (internal quotation marks omitted) (quoting United States v. Pizaro-Berríos, 448 F.3d 1, 7 (1st Cir. 2006)); see also United States v. Matos, 611 F.3d 31, 44 (1st Cir. 2010) ("[P]ursuant to the MVRA, 18 U.S.C. § 3663A, where the defendant's criminal conduct includes 'an offense that involves as an element a scheme,

conspiracy, or pattern of criminal activity,' a victim is defined as 'any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern,'" and "the district court may order restitution without regard to whether the conduct that harmed the victim was conduct underlying the offense of conviction." (quoting 18 U.S.C. § 3663A(a)(2) (2008))).

Second, Rocheford argues that "the losses the court . . . attributed to the defendant are too remote -- factually and temporally -- from the discre[te] incidents and circumstances surrounding her convictions." To support this argument, Rocheford contends that the restitution amount of $739,852 wrongly overlooks the fact that the jury did not convict Rocheford on all counts.

Rocheford fails to develop any specific argument, however, as to why any amount over $17,534 is necessarily too "factually and temporally" remote to support an order of restitution or sentencing enhancement. And while the jury may have been unable to conclude beyond a reasonable doubt that Rocheford was responsible for the wire transfers mentioned in the counts for which she was acquitted (counts 4 and 8), for purposes of sentencing, the District Court was required to apply the less stringent preponderance of the evidence standard. See Curran, 525 F.3d at 78. Under that less stringent standard, the record sufficed to permit the District Court to find Rocheford responsible for those (and other) transfers by victims.

## VI.

We, therefore, **<u>affirm</u>** Pena's and Rocheford's convictions and sentences.