16 F.3d 401
NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
 Dominga VAZQUEZ, Plaintiff, Appellant,
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant, Appellee.
 No. 93-1429.
 United States Court of Appeals,
First Circuit.
 February 11, 1994
 
 Appeal from the United States District Court for the District of Puerto Rico
 Salvador Medina De La Cruz on brief for appellant.
 Charles E. Fitzwilliam, United States Attorney, Jose Vazquez Garcia, Assistant United States Attorney, and Jan B. Brown, Assistant Regional Counsel, Dept. of Health and Human Services, on brief for appellee.
 D. Puerto Rico.
 AFFIRMED.
 Before Cyr, Boudin and Stahl, Circuit Judges.
 Per Curiam.
 
 
 1
 Dominga Vazquez appeals from a district court decision affirming the Secretary of Health and Human Services' final decision denying Vazquez disability benefits under the Social Security Act. Vazquez alleged disability on the basis of her heart condition, diabetes, high blood pressure, dizzy spells, and pain in her shoulders and back. The administrative law judge (ALJ) concluded that Vazquez has "severe rheumatic heart disease, atrial fibrillation, post mitral valve prosthesis implantation, controlled diabetes mellitus, low back pain, mild arthritis of the right shoulder and mild anxiety," but that those impairments did not meet or equal the applicable Listings. See 20 C.F.R. Pt. 404, Subpt. P, App. 1. The ALJ granted partial credibility to Vazquez's allegations of inability to work due to chest, shoulder and back pain. Relying exclusively on the residual functional capacity evaluation of a testifying, nonexamining medical advisor, the ALJ specifically found that Vazquez could perform "work-related activities except for work involving lifting and carrying more than 20 lbs., prolonged standing or walking, kneeling, extreme trunk movements and reaching above shoulders level." Accordingly, she determined that Vazquez could perform her past relevant work as a secretary as well as the job of routing clerk, both of which are sedentary jobs. Because the record as a whole supports this finding, we affirm.
 
 
 2
 Vazquez raises several objections to the ALJ's decision. In this opinion, we comment only on the issues that require some further elaboration than was given in the district court decision.
 
 I. Post-Hearing Evidence
 
 3
 After being denied disability benefits, Vazquez sought Appeals Council review of the ALJ's decision. Arguing that she had new and material evidence of her disability, she submitted to the Council hospital records of her December 1990 emergency hospitalization for atrial fibrillation. Because the hospital had not provided the records to Vazquez in time for the January 1991 hearing, the ALJ had not considered those records in determining that Vazquez was not disabled. The Appeals Council concluded that the records provided no basis for changing the ALJ's decision, stating that "this evidence does not show a significant change in the claimant's cardiac status."[1]
 
 
 4
 Included in the new records was the copy of an electrocardiogram (ECG) dated December 21, 1990. At the top of the ECG is the following caption: "Normal Sinus Rhythm, Rate 95 Widespread Ischemia, Possibly Acute ST Depression Suggests Widespread Subendocardial Injury Baseline Wander in Lead(s): V2." On appeal, Vazquez says that this ECG "revealed severe abnormalities of cardiac origin which created more than a reasonable possibility of supporting a different result" in her case. She says further that the Appeals Council could not analyze her residual functional capacity (RFC) in light of this "raw medical data" without professional medical assistance, and that this new evidence undermined both the medical advisor's testimony as to Vazquez's RFC and the vocational expert's testimony in response to a hypothetical that did not include the "more severe residuals" suggested by the ECG.
 
 
 5
 We disagree for the following reasons. First, strictly speaking, the "findings" on this ECG duplicated material already in the record reviewed by the medical advisor Dr. Jaume before he testified at the hearing. The record includes the copy of an ECG dated January 27, 1990, from the period of Vazquez's first hospitalization following her mitral valve prosthesis surgery in 1989. That ECG states in part "Widespread Ischemia Diffuse Nondiagnostic ST Depression." In his testimony, Dr. Jaume specifically stated that he had concluded that Vazquez's chest pain was not of ischemic origin because all available medical reports indicated that her coronaries were normal, her description of pain was not consistent with ischemic-type pain, and she was not being given medications for ischemic pain.[2]
 
 
 6
 Second, the "findings" on the December 1990 ECG resulted in no new diagnosis of Vazquez's condition and no change in her basic treatment plan. Dr. Vazquez, Vazquez's treating physician, diagnosed Vazquez as having "atrial fibrillation/status post mitral valve prolapse," and made no mention of ischemia or subendocardial injury. That diagnosis matches in relevant respect the diagnosis given after Vazquez's hospitalization in January 1990, which both the ALJ and Dr. Jaume had accepted as a correct description of Vazquez's impairment.[3] In addition, Dr. Vazquez's progress notes from December 21 indicate that he was continuing Vazquez's previous medications. Although he also prescribed a new medication (Quinaglute), its purpose, like some of the other medications Vazquez was already receiving, was to control heart arrythmia, including atrial fibrillation, and not ischemia or ischemic pain.[4]
 
 
 7
 Finally, in his discharge summary dated December 21, Dr. Vazquez placed no restrictions on Vazquez's activity. Thus, the Appeals Council could reasonably conclude from the hospital records themselves, without improperly interpreting the actual ECG, that Dr. Vazquez believed that Vazquez was able to engage in the same activities after her December hospitalization as before, that Vazquez's cardiac condition had not changed significantly as of December 1990, and that Dr. Vazquez had only adjusted her medication so as to more effectively control the atrial fibrillation.[5]
 
 
 8
 Having said this, we note that it was up to Vazquez to show on appeal why the decision below was wrong. She has not proffered any medical report or professional opinion showing that the December 1990 ECG's apparent finding of "widespread ischemia" should be accepted as a valid, new diagnosis of her condition. The section of the Listings which deals with ischemic pain and ischemic heart disease suggests that that finding cannot be accepted at face value, and confirms that the December ECG requires medical explanation before we could assume that it evidences ischemic heart disease or pain. We describe only briefly why this is so.
 
 
 9
 First, chest pain of cardiac origin (which results from ischemic heart disease) is precipitated by effort and promptly relieved by nitroglycerin or rapid nitrates or by rest. It is a "crushing, squeezing, burning, oppressive pain" in the chest, but not a "sharp, sticking, or rhythmic" pain. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Sec. 4.00D, 4.00E.
 
 
 10
 The most specific evidence of Vazquez's pain is found in Dr. Escalona's report of his examination of Vazquez in April 1990. Vazquez reported three types of chest pain: a continuous "dull and profound" chest pain in the surgery area which was exacerbated by backward neck movements; a "profound, dull and severe" chest pain on both sides of the chest (the "hemithoraxes") that had occurred only once when she had had atrial fibrillation (in January 1990); and a "stabbing" pain in the area over her heart and lower chest ("precordium") of unknown causation which occurred several times a week. Neither of the first two types of chest pain was relieved by rest. Thus, to the extent that Vazquez's "dull" chest pain could be equated with the "squeezing" or "oppressive" pain described in the Listings, it would nonetheless apparently not be pain of cardiac/ischemic origin because resting did not relieve it. On the other hand, the "stabbing" pain which Vazquez reported was relieved by rest, but the very description of the pain as "stabbing" in nature would rule out pain of cardiac/ischemic origin.
 
 
 11
 Second, the Listings indicate that certain noncoronary medical conditions can cause pain that "masquerades" as angina, e.g., hiatal hernia, esophagitis, and musculoskeletal lesions such as cervical arthritis. In 1989, Vazquez was diagnosed with hiatal hernia, which was also characterized as an "esophogeal hernia." Although no medical report stated that she had cervical arthritis, Dr. Escalona concluded in April 1990 that she had "mild degenerative changes" and "calcific densities" in her right shoulder which might be "osteoarthritis" and that she had "mild diffuse degenerative changes" in her cervical spine.
 
 
 12
 Third, the Listings indicate that certain drugs, especially digitalis, may be a noncoronary cause of ECG abnormalities, especially if the abnormality involves the ST segment; for that reason, the Listings stress the importance of obtaining a predigitalis ECG tracing. Id. Sec. 4.00F. The records for Vazquez's December 1990 hospitalization indicate that she was given digitalis at the hospital and that she took digitalis on a daily basis, at least while in the hospital. Her December ECG showed depression of the ST segment with possible widespread subendocardial injury. As the Listings indicate, the ST abnormality may reflect only the fact that Vazquez had been given digitalis before the ECG and not the fact that she had any actual subendocardial injury.
 
 
 13
 Finally, the Listings indicate that certain ECGs, done in conjunction with exercise tests, falsely indicate abnormalities in women with mitral valve prolapse and that post-hyperventilation tracings may be essential to properly evaluate such ECGs. Id. Although the record does not indicate whether the December 1990 ECG was done along with an exercise test, and we do not know whether such false indications would also obtain for women with mitral valve prosthetics, at a minimum this section of the Listings underscores the need for professional evaluation of any ECG done on a woman with Vazquez's medical profile before any conclusions can be drawn from the face of the ECG.
 
 
 14
 In sum, the December 1990 ECG provides no basis for disturbing either the ALJ's decision that Vazquez was not disabled or the Appeals Council's decision that the ECG did not show a "significant change in [her] cardiac status." The hospital records from December 1990 show that Dr. Vazquez's diagnosis of Vazquez's heart condition had not changed from the time of her first hospitalization in January 1990. Moreover, Dr. Jaume reviewed an ECG done during that hospitalization which had also suggested that Vazquez had widespread ischemia, but obviously found it of no diagnostic value in view of the fact that she had normal coronaries, had not described ischemic-type pain, and was not being given medications to relieve ischemic pain. Nor did the ostensibly abnormal January 1990 ECG cause Dr. Vazquez to diagnose Vazquez as having ischemic heart disease.[6] In the absence of a professional medical opinion interpreting the December 1990 ECG to confirm that Vazquez has ischemia, or at least some indication that Vazquez was being given ischemic pain medication after her December hospitalization, we do not think that Vazquez has met her burden of showing that the December 1990 ECG, submitted to the Appeals Council after the January 1991 hearing, altered the original evidentiary picture presented to the ALJ at the hearing.
 
 II. Due Process
 
 15
 In its pre-hearing review of Vazquez's claim, the Department of Health and Human Services (HHS) had a family physician, Dr. Escalona, examine Vazquez. In April 1990, Dr. Escalona took Vazquez's medical history and gave her a physical examination, which included a detailed examination of the range of movement in her shoulders, elbows, wrists, fingers, knees, hips and spine. He discovered some limitations in her ability to move or flex her right shoulder, hips and spine (both the cervical and lumbar regions). Dr. Escalona also referred Vazquez to a radiologist for a chest, lumbar spine, right shoulder and cervical spine evaluation (conducted apparently by way of X-ray). On the basis of his and the radiologist's examinations, Dr. Escalona diagnosed Vazquez as having "hypertensive cardiovascular disease, angina pectoris, ischemic heart disease, atypical chest pain, atrial fibrillation by history, diabetes mellitus, mitral valve replacement, tensional headache, gastritis due [to] medications, insomnia, low back pain possible discogenic disease, L5S1 level, right shoulder osteoarthritis possible, and rotator cuff injury." He also submitted a form to HHS in which he described Vazquez's chest pain in detail.
 
 
 16
 On the basis of Dr. Escalona's report and other medical records, two Social Security physicians concluded that Vazquez could stand, walk and sit (with normal breaks) about 6 hours per 8-hour workday and that she could push or pull objects without limitation. One of those physicians reviewed the results of Dr. Escalona's range of movement examination and concluded that Vazquez's ability to flex at the hips, bend forward and reach was limited. He concluded that she could climb, balance, stoop, kneel, crawl and crouch only occasionally; he also stated that she should "avoid work where reaching above shoulder level is needed."
 
 
 17
 After HHS denied Vazquez benefits, Vazquez asked for a hearing before an ALJ. Vazquez's attorney subsequently submitted interrogatories to the ALJ for her review, which he sought to have completed by Dr. Escalona. The attorney stated that HHS had used Dr. Escalona's report in deciding Vazquez's claim, that it had not obtained Dr. Escalona's medical opinion of Vazquez's RFC, and that he had a right to cross-examine Dr. Escalona on his medical opinion. At the hearing, the ALJ denied the request to submit interrogatories to Dr. Escalona, explaining that an RFC assessment could be given at the hearing, that most or all of the questions posed in the interrogatories had been answered in Dr. Escalona's medical report (and that not even Vazquez's treating physician had been able to respond to all of the questions when Vazquez had sent the same interrogatories to him), that the range of movement evaluation and Vazquez's complaints as noted in Dr. Escalona's report indicated Vazquez's RFC and thoroughly described her pain, and that a medical advisor would testify at the hearing to interpret Dr. Escalona's specific findings. Although obviously eager to obtain answers to his interrogatories, Vazquez's attorney did not object to the admission of Dr. Escalona's report into evidence. In fact, he waived his client's right to testify because the report had been admitted into evidence, explaining that, "as your Honor indicated, the description of the signals and symptoms and limitations are very well described by Dr. Escalona."
 
 
 18
 On appeal, Vazquez claims that the admission of the report into evidence violated her right to due process because the written interrogatories had not been answered and her attorney had not been permitted to cross-examine Dr. Escalona. Of the cases cited by Vazquez to support her claim, the case most on point is Lidy v. Sullivan, 911 F.2d 1075 (5th Cir. 1990), cert. denied, 111 S. Ct. 2274 (1991). In that case, a physician had submitted a report which apparently concluded that claimant's alleged pain was not disabling, and the ALJ had based his finding that the claimant was not disabled on that report. The claimant sought to subpoena the physician for cross-examination. The ALJ refused the request, but permitted the claimant to submit written interrogatories to the physician instead. When the claimant sought to submit a second set of interrogatories in order to clarify answers she thought were vague and evasive, and pressed her request to cross-examine the physician at a hearing, the ALJ denied the request, stating that additional interrogatories would not be helpful. The Fifth Circuit found that the claimant's due process rights had been violated, holding that a claimant has an absolute right to subpoena a reporting physician. In reaching its conclusion, the Fifth Circuit interpreted Richardson v. Perales, 402 U.S. 389 (1971), to imply that the entitlement to a subpoena is automatic, summarily dismissed arguments that a claimant's right to a subpoena is qualified under the regulations,[7] and stated its belief that other circuits had arrived at similar conclusions.
 
 
 19
 We see no need to decide for this circuit at this time the question whether an ALJ must grant a disability insurance claimant's request to subpoena a reporting physician since it is clear that there was no due process violation in this case. Had Dr. Escalona arrived at some medical opinion inimical to Vazquez's claim of disability upon which the ALJ had relied in determining that Vazquez was not disabled, and had the ALJ denied Vazquez a request to subpoena Dr. Escalona and cross-examine him at a hearing, then due process concerns could well have been implicated. Here, however, Dr. Escalona expressed no opinion about Vazquez's RFC, and Vazquez did not ask the ALJ to subpoena him to appear at the hearing (though we recognize that Vazquez made clear her intent to obtain relevant evidence from Dr. Escalona by way of answers to interrogatories). Nor was Dr. Escalona's report adverse to Vazquez. Far from undermining Vazquez's claim of disability, Dr. Escalona's report provided the only medical support for Vazquez's claim of disability due to diabetes mellitus, and it provided significant medical support for her claim of disability due to musculoskeletal conditions of sufficient severity to cause flexing and reaching limitations and back and shoulder pain.[8] Dr. Escalona's report appears to have been the basis for Dr. Jaume's testimony at the hearing that Vazquez did have certain medical impairments which affected or might affect her RFC. (He testified that the calcifications detected in Vazquez's right shoulder could cause shoulder pain, that perhaps she should avoid flexing the trunk of her body, and that she should not lift objects over shoulder level.) In addition, while not fully crediting Dr. Escalona's various diagnoses, the ALJ's use of the information in Dr. Escalona's report worked primarily to Vazquez's advantage; the ALJ specifically found that the medical evidence established that Vazquez had, among other things, "controlled diabetes mellitus, low back pain, mild arthritis of the right shoulder ...," and she partially credited Vazquez's allegations of pain in her chest, shoulders and back. She also found that Vazquez could not engage in work "involving lifting and carrying more than 20 lbs., prolonged standing or walking, kneeling, extreme trunk movements and reaching above shoulders level." Moreover, as we indicated earlier, the hearing transcript shows that Vazquez believed that Dr. Escalona's report was favorable. Her attorney did not object to admitting the report into the record, acknowledged that it described her limitations well, and determined that Vazquez herself need not testify because the report described her limitations so thoroughly.
 
 
 20
 Finally, the record suggests to us that Vazquez's interest in cross-examining Dr. Escalona actually was quite minimal. She did not seek to subpoena Dr. Escalona to appear at the hearing for cross-examination, but rather sought only to have him answer specific interrogatories in order to obtain his assessment of Vazquez's RFC. Moreover, Dr. Jaume provided an assessment of Vazquez's RFC at the hearing, which was based on Dr. Escalona's report among other things, and Vazquez's attorney was able to cross-examine Dr. Jaume freely at the hearing.
 
 III. Non-examining, Non-testifying RFCs
 
 21
 Lastly, Vazquez says that two RFC assessments in the record which were prepared by Dr. Arzola and Dr. Acevedo, non-examining, non-testifying physicians who reviewed Vazquez's medical record, were not supported by subsidiary findings. Vazquez claims, accordingly, that the assessments did not constitute substantial evidence to support the ALJ's determination that Vazquez was not disabled. The record shows that both physicians supported their RFC assessments with sufficient subsidiary findings, and so we find Vazquez's objection to be without merit. In addition, the ALJ did not rely on Dr. Arzola's and Dr. Acevedo's RFC assessments in determining that Vazquez was disabled, but based her finding of disability on the testimony given at the hearing by Dr. Jaume and the vocational expert. For that reason, even if the two RFCs referred to by Vazquez had not been supported by adequate subsidiary findings, her present claim would be essentially moot.
 
 
 22
 Affirmed.
 
 
 
 [1]
 The entire commentary of the Appeals Council was as follows: "[T]he Appeals Council carefully considered the record notes of hospitalization at the Bella Vista Clinic on December 19, 1990. However, this evidence does not show a significant change in the claimant's cardiac status. The claimant received medication adjustment to control her atrial fibrillation. On discharge, a couple of days later, the claimant had returned to normal sinus rhythm (Exhibit AC-1). The Appeals Council is of the opinion that the additional evidence does not provide a basis for changing the [ALJ]'s decision."
 
 
 [2]
 "Ischemia" is a deficiency of blood in an organ due to the functional constriction or actual obstruction of a blood vessel. Dorland's Illustrated Medical Dictionary 857 (27th ed. 1988). "Myocardial ischemia" is a deficiency of blood supply to the heart muscle due to an obstruction or constriction of the coronary arteries. Id
 
 
 [3]
 The January discharge summary gave as a final diagnosis: "Atrial fibrillation with rapid ventricular response. Mitral valve prolapse. Prosthetic mitral valve. Cardiomegaly with pulmonary congestion. Urinary tract infection. Hyperglycemia."
 
 
 [4]
 The Physician's Desk Reference states that Quinaglute consists of quinidine gluconate, an isomer of quinine, and that it is used to control various arrhythmias. Physician's Desk Reference 688 (47th ed. 1993). Exhibit 19 of the record is the prescription sheet used by Dr. Vazquez on December 21, 1990, to prescribe Quinaglute. During the hearing, Dr. Jaume commented that Quinaglute is "quinine" and that it is used sometimes to convert "from an iatric fibrotic to a sinusoid rhythm"; at the hearing, he also testified that no medications for ischemic pain had been prescribed for Vazquez. Accordingly, we conclude that Dr. Vazquez prescribed Quinaglute not for ischemia but for Vazquez's atrial fibrillation
 
 
 [5]
 Dr. Vazquez's handwritten notes on the December ECG may also indicate that he discounted any suggestion that the ECG showed abnormality in view of Vazquez's normal sinus rhythm. Immediately under the caption suggesting widespread ischemia and widespread subendocardial injury, Dr. Vazquez scrawled two abbreviations "NSR" and "NAD", followed by two indecipherable words. "NSR" likely means "normal sinus rhythm." See G. Hamilton & B. Guidos, Medical Acronyms, Symbols and Abbreviations 180 (2d ed. 1988). "NAD" may stand for "no acute distress, no appreciable disease, normal axis deviation, [and] nothing abnormal detected." Id. at 168. ("NAD" can also stand for "nicotinamide adenine dinucleotide" or "nicotinic acid dehydrogenase." Id. Although in context neither term would appear to be applicable, it is not inconceivable that Dr. Vazquez meant the abbreviation "NAD" to refer to one of those terms given the electronically based nature of ECG equipment. See Dorland's Illustrated Medical Dictionary 440, 1137 (27th ed. 1988) ("nicotinamide adenine dinucleotide" is a coenzyme involved in numerous enzymatic reactions in which it serves as an electron carrier; "dehydrogenase" is an enzyme that catalyzes the transfer of the hydrogen of electrons from a donor to an acceptor compound))
 
 
 [6]
 Dr. Escalona, a consultative physician who was a family doctor and not a cardiologist, examined Vazquez and diagnosed her as having "angina pectoris" and "ischemic heart disease," but did not describe how he came to that conclusion. His conclusions could only have been based on Vazquez's description of pain, the January 1990 ECG which suggested ischemia, or an X-ray evaluated by the radiologist Dr.Acevedo, to whom Dr. Escalona had referred Vazquez. At the hearing, Dr. Jaume, a cardiologist, explained why the medical record showed that Vazquez did not have ischemic heart disease. Dr. Acevedo's diagnostic impression of the X-ray was that Vazquez had "cardiomegaly" (enlargement of the heart) and "uncoiling of the aorta," but that otherwise her chest was "negative." He made no reference to her coronaries. According to Dr. Jaume, it is the status of the coronaries which indicates whether ischemic heart disease is present. Even assuming that a diagnosis of cardiomegaly bears on the issue of ischemic heart disease, Dr. Jaume indicated that a diagnosis of cardiomegaly on the basis of an X-ray is not always reliable and that the existence of cardiomegaly does not necessarily mean that heart functioning is compromised. No physician drew any conclusions about the significance of Vazquez's uncoiled aorta, nor has Vazquez referred to that issue (or to the issue of cardiomegaly) on appeal or below, and so we conclude that neither diagnosis is relevant to the question of ischemic heart disease
 
 
 [7]
 The regulations provide that, "[w]hen it is reasonably necessary for the full presentation of a case, an administrative law judge or a member of the Appeals Council may, ... at the request of a party, issue subpoenas for the appearance and testimony of witnesses...." 20 C.F.R. Sec. 404.950(d)(1) (1991)
 
 
 [8]
 Hospital records of Vazquez's January 1990 hospitalization state that Vazquez had "right shoulder peritendinitis calcarea ... and probably discogenic disease of L5S1." They also describe her complaints of low back, leg and shoulder pain. But the records provide no further analysis of these conditions. Thus, Dr. Escalona's examination results of Vazquez's range of movement and Dr. Acevedo's evaluation of Vazquez's X-ray provided critical clinical support for her claim of disability on the basis of her musculoskeletal conditions