# United States Court of Appeals
## For the First Circuit

---

No. 18-1140

UNITED STATES OF AMERICA,

Appellee,

v.

GREG TAKESIAN,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

---

Before

Howard, Chief Judge,
Thompson and Barron, Circuit Judges.

---

Tina Schneider for appellant.
Randall E. Kromm, Assistant United States Attorney, with whom Andrew E. Lelling, United States Attorney, was on brief, for appellee.

---

December 18, 2019

---

**THOMPSON**, **Circuit Judge**.  Greg Takesian is a certified-public-accountant-turned-tax-cheat.  Or so a jury essentially concluded in convicting him of four counts of filing false tax returns, see 26 U.S.C. § 7206(1), and one count of attempting to obstruct the internal-revenue laws, see 26 U.S.C. § 7212(a).  A district judge at sentencing hit him with concurrent prison terms of 24 months on each count, 12 months of supervised release following the end of his incarceration, a special assessment of $100 on each count, a $10,000 fine, and restitution totaling $286,433.  None too happy with these results, Takesian argues here that the judge thrice erred:  first, by letting prosecutors impeach him with his 2006 conviction for making a false statement; second, by failing to tell the jury that to convict on the obstruction count, prosecutors had to prove that he obstructed a particular tax-related proceeding that he knew about or could reasonably foresee; and third, by ordering restitution beyond what the jury found the government's tax loss to be.  Disagreeing with him, we affirm.

## BACKGROUND

Below is a barebones summary of the relevant facts, presented in as balanced a manner as possible.  See, e.g., United States v. Rodríguez-Soler, 773 F.3d 289, 290 (1st Cir. 2014).

## Government's Case

The government's witnesses (primarily law-enforcement agents), plus the documentary evidence, provided the following narrative:

Together with his father, Michael (we use his first name not out of disrespect, but to avoid confusing references to persons with the same last name), Takesian formed a company in 2002 called Takesian & Company (from now on, "T & C") — an S corporation for federal-tax purposes. For an S corporation, profits and losses flow through to the shareholders and must be reported on their personal tax returns. The annual amount of profit or loss to a given shareholder is reflected in a form known as a "Form K-1," which the S corporation files with the Internal Revenue Service (familiarly known as the "IRS") and the shareholders use to prepare their personal returns. Initially, Takesian held a 25% ownership share and Michael held a 75% share. But from 2007 through 2015 (when T & C dissolved), Michael was the sole owner. Takesian, though, served as T & C's president and treasurer, handling T & C's day-to-day operations.

In its early years, T & C did tax work for a number of clients. But that changed in 2007, when the father-son duo started working almost full time for Michael Galatis, doing bookkeeping and accounting jobs for Galatis and At Home VNA (Galatis's

visiting-nurse company).  From 2008 to 2011, Galatis and At Home VNA paid T & C about $2 million, which ended up being deposited in T & C's bank accounts.  Takesian had access to T & C's accounts during that same period, however.  And he put close to $1 million of this money to his own use, through checks, cash withdrawals, and credit-card payments.  A few examples:  he used the money to pay for his rent and to underwrite an investment in a food truck, as well as to support his wife (from whom he was separated) and a woman he was romantically involved with (she was studying to be a massage therapist).

Takesian did not timely file his personal tax returns for tax years 2008-2010.  From July 2011 through early 2012, however, he filed personal tax returns for tax years 2008-2011 for himself and his wife.  He signed each return, attesting — under penalty of perjury — that they were "true, correct, and complete." None of the returns reflected the money from T & C that he had put to his personal use.  For instance, the 2008 return did not report any income from T & C — it showed only $12,766 in wages from Cerebral Palsy of Massachusetts and about $10,000 in gross receipts for a consulting business called "Greg C. Takesian, CPA."  Yet during that year, he took $159,044.99 from T & C's accounts for personal purposes.

As part of a healthcare-fraud investigation of At Home VNA (which received Medicaid and Medicare funds), federal agents executed a search warrant at At Home VNA's offices in December 2011.  During the search, the agents ran into Takesian, who was working in an office in the same suite.  And he voluntarily said that he did accounting work for At Home VNA and Galatis.  He also voluntarily gave the agents 26 boxes of warrant-related documents.

Sometime in 2012, the IRS began investigating T & C and Takesian.  But the healthcare-fraud investigation continued too. And in April 2013, as part of the healthcare-fraud probe, a federal grand jury subpoenaed T & C's documents memorializing T & C's income, expenses, and debts for 2006 through 2011, including copies of corporate tax returns and loans receivable (loans receivable is an account in a lender's general ledger showing the current balance of all loans owed to it).[1]  About a month later, in May 2013,

---

[1] The subpoena asked T & C's keeper of records to produce "[a]ll corporate records and books of account relative to [T & C's] financial transactions" from January 1, 2006 through December 31, 2011, including but not limited to

ALL CORPORATE BOOKKEEPING RECORDS and other financial records including General Ledger, General Journals, all Subsidiary Ledgers and Journals, Gross Receipts and income records, Cash Receipts and Disbursement records and/or Journals, sales and Purchase records and/or Journals, Accounts Receivable and Payable Ledgers and records, Bad Debt records, Cost of goods Sold records, Loan Receivable and Payable Ledgers, Voucher Register and all sales and expense invoices including all invoices documenting expenses paid by cash (currency) or

- 5 -

Takesian personally delivered documents to the U.S. Attorney's Office in Boston, Massachusetts. He tried to talk with the prosecutor on the case. But the prosecutor said that he would only speak to Takesian with Takesian's attorney present. Takesian then said that he had brought "everything . . . related" to At Home VNA and Galatis. He also said that he had brought copies of T & C's tax returns for tax years 2008-2011 — returns (the government later learned) that he had printed out a day earlier but had never filed.

In August 2013, Lauren Youngquist — an agent with the IRS's criminal investigation division involved with the At-Home-VNA case — interviewed Takesian. She said that she was not investigating him, however. Actually, she never told him that he was under investigation at all. But she did ask him about his and T & C's tax returns.

Fast forward a bit to March 2014. Agents interviewed Michael about T & C's tax filings and operations, as well as Takesian's role at T & C. Michael confirmed that Takesian had

---

bank check (cashier or teller checks) and retained copies of any bank checks (cashier or teller checks.)

A copy of the accounting software files used in the daily operation of [T & C].

Copies of all U.S. Corporation Income Tax Forms 1120 and/or all U.S. Income Tax returns for an S Corporation Forms 11205.

given him "K-1 information" to prepare his (Michael's) tax returns. Agents told Michael that Takesian had not yet filed T & C's tax returns, which surprised Michael because Takesian had given him info from the K-1 forms associated with those returns and Michael had relied on the info for his own taxes. Agents also gave Michael a subpoena directing him to appear and testify before a federal grand jury in April 2014.

A few months after this interview, in July or August 2014, Takesian filed T & C's corporate returns for tax years 2008-2011. Among the differences between those returns and the unfiled returns he had previously given the government, two stand out: (1) the filed returns reflected tens of thousands of dollars of unspecified "loans" to an unidentified T & C "officer," unsupported by any documents in the T & C files that he had provided earlier (identifying these amounts as loans meant they did not need to be counted as income by the loan's recipient); and (2) the filed returns included K-1 forms that did not match the unfiled ones.

Also around this time, Takesian filed amended personal returns for tax years 2008-2011. These returns identified additional income and new deductions. But despite the additional income, the amounts reported there did not account for all of the T & C money that he took for his personal use. And some of the new deductions seemed off. To take just one example, in some of

the amended returns he claimed over $100,000 in losses through theft or fraud, but court records from a civil suit involving him indicated that he had earlier pegged the loss at $43,000.

Of course, Takesian tested the prosecutors' case through his lawyer's cross-examination of their witnesses. For instance, on cross-examination, defense counsel elicited testimony from IRS agent Youngquist that while she recalled asking Takesian questions in August 2013 about T & C's "tax returns and his personal tax returns," she could not "remember if [she] had the actual tax returns in front of [her]" — and she agreed that if she did not have his returns right then and there, she "most likely" would not "have . . . asked him questions" about his returns.

Based on the evidence it had amassed, and focusing on tax years 2008-2011, the prosecution contended that Takesian's failure to accurately disclose his income from T & C and to correctly calculate his deductions resulted in an estimated tax underpayment of $286,433.

**Defense's Case**

Looking to counter the government's narrative, Michael and Takesian essentially testified as follows:

Michael said that he let Takesian "borrow" money from T & C to "invest." "I didn't care what he did with it," Michael added, "except that [Takesian] knew he had to pay the money back."

- 8 -

And because of their father-son relationship, they did not do "anything formal as far as signing notes, and so forth," but instead relied on a "gentlemen's agreement"[2] — though Michael admitted that he did not tell the grand jury about the loans. Turning to the T & C credit cards, Michael said that he let Takesian use them, with no strings attached.

Taking the stand in his own defense, Takesian said that Michael had told him that he could use T & C's funds and credit cards as he "saw fit," as long as he did not deduct personal expenses on T & C's returns. He also said that he did not report the money his father had loaned him because loan proceeds do not qualify as income to the borrower. He said as well that he did not report various personal payments he had made (to his wife and girlfriend, for the food truck, *etc.*) because he had used the loan proceeds to make them — and loan proceeds, he repeated, are "non-taxable." Plus he said that he had drafted T & C's final returns and his amended returns the way he did because he had changed how T & C's returns would be structured, moving certain income and

---

[2] According to a widely used legal dictionary, a "gentlemen's agreement" is "[a]n unwritten agreement that, while not legally enforceable, is secured by the good faith and honor of the parties." See *Gentlemen's Agreement*, Black's Law Dictionary 801 (10th ed. 2014) [henceforth, "Black's Law"]; see generally United States v. Romero, 906 F.3d 196, 208 (1st Cir. 2018) (calling that dictionary "the go-to dictionary for courts in figuring out the commonest legal meanings of terms").

losses from T & C to himself and Michael — which he did after talking with Michael. And he said that the government "never told" him that the IRS had targeted him for investigation and that he never received a subpoena requiring him to produce his tax returns.

The government's cross-examination of Takesian established several points. For example, when asked if "Youngquist asked . . . you questions about [T & C] and your tax returns?" he responded, "Yes, brief questions about [T & C] and my tax returns" — though he then said that she "had no tax returns" and "didn't ask me anything about that." He did admit that T & C's unfiled returns did not mention the loan reflected in the later return — though he claimed that the loan came not from T & C but from Michael and was included in the filed T & C return for record-keeping purposes. He also said that about a month after agents interviewed Michael in March 2014, a prosecutor "threatened" to "get" him and his father. "So with all this going on," the government asked, "is it your testimony that you had no idea that you are somehow [the] subject of a federal investigation at this time?" — to which Takesian indicated that he knew he and T & C were under investigation too, though he believed (based on the questions asked of him) that the investigation centered on whether he and Michael "were overpaid or . . . laundering money . . . for Galatis"; "it was never about [his] tax returns," he added.

## Parties' Summations and Judge's Instructions

In its closing argument, the government (among other things) criticized Takesian's theory of the case.  "Takesian," the government argued,

> a CPA . . . for 25 years, . . . submitted fraudulent and false income tax returns to the IRS, concealing close to a million dollars in income . . . from the IRS. . . . When he got caught and the IRS . . . started asking questions, . . . he doubled down on those lies, and instead of trying to make things right and filing corrected amended returns, he created fictitious loans that came out of nowhere[;] he created fraudulent deductions that tenfold increased the amount of money to account for all the spending he had been doing for the years.

Insisting that Takesian used T & C's "bank account . . . like his own personal piggy bank" and that he knew "how much money . . . he ha[d] spent," the government argued that he also knew that he was "under investigation," pointing to the "subpoenas"; "the draft filings he delivered to the U.S. Attorney's Office"; and "the amended filings he made," which "included the fraudulent and fictitious loans and the fraudulent and inaccurate deductions that are out of whack with reality."

In his closing, defense counsel argued (among other points) that Michael had "loaned" Takesian about $1 million.  On the obstruction issue, counsel argued that prosecutors had not proved "the exact and precise date that . . . Takesian was actually

- 11 -

placed on notice that his personal tax returns . . . were being investigated[.]"  "[T]hey've alluded to a date," counsel said, and

> there may be evidence of what that date may or could have been, but where is the individual that took the stand and said 'I' . . . in fact told . . . Takesian, on a certain date at a certain place at a certain time, that his personal tax returns were being investigated?

Suggesting an answer to his own question, counsel said "there was no witness," adding as well that the prosecution had "the burden . . . to establish that."

The government's rebuttal closing asked the jury (as relevant here) to reject "the idea that [Takesian] had no idea that he was under investigation" and to find that he acted as he did because "he got caught" and "was trying to trick the IRS." "[F]or you to believe that there was a loan in this case," the government argued, "a loan that wiped out hundreds of thousands of dollars in income, you have to believe . . . Greg Takesian," a person convicted "in 2006 . . . of a felony offense of making a false statement, . . . and you can consider that evidence in evaluating his credibility."

The judge instructed the jury (in pertinent part) that the government had to prove that Takesian "willfully" filed "false" federal tax returns — which means "he did it voluntarily, he intended the violation of a known legal duty."  The judge explained

that "the law does permit you to make a good faith amendment" to the returns.  But, the judge said,

> [t]he government claims they were not.  [It] claim[s] that this business about a loan from the father, Michael, to the son, Greg, that's all after the fact, that's all made up . . . once . . . Greg Takesian came to understand that the Internal Revenue people were investigating him and the propriety of his returns.

Focusing on the obstruction charge, the judge instructed that the government had to prove

> [t]hat . . . Takesian . . . did something in an effort to obstruct or impede the due administration of the Internal Revenue laws in the manner charged, and the manner charged is this business about a loan — not just the filing of amended returns, but anything about this business about a loan.

And the government also had to prove that Takesian

> did . . . do that corruptly[.]  To act 'corruptly' means to act with the intent to secure an unlawful advantage . . . .  'Obstruct and impede' mean[] to hinder, interfere with, create obstacles, make it difficult, the intentional concealment of income or other assets from the IRS.

### Jury's Verdict and Judge's Sentence

Unfortunately for Takesian, the jury rejected his case theory, convicting him of filing false returns in the tax years 2008-2011, and of attempting to obstruct or impede the IRS.  And as relevant here, the judge then ordered concurrent 24-month prison

terms for each count, a $100 special assessment for each conviction, and $286,433 in restitution.

## ISSUES AND RULINGS

We now turn to the legal issues before us, adding further details as needed to put matters into perspective.

## Prior-Conviction Issue

First up is Takesian's claim that the judge stumbled by admitting for impeachment purposes a false-statement conviction he incurred in 2006 — an error that he says should compel us to reverse his false-tax-return and obstruction convictions.

### *Setup*

Takesian moved *in limine* before trial to stop prosecutors from (among other things) trying to introduce his 2006 false-statement conviction.[3] Relying on Federal Evidence Rule 609, he basically argued that any probative worth that this conviction had was "substantially outweighed by its prejudicial effect," given its remoteness to the present allegations.[4] Responding, the

---

[3] An objection based on the Federal Evidence Rules may be made during trial. See Fed. R. Evid. 103(a)(1). But a party can ask for a decision under the Rules before trial, which is what an *in limine* motion is. See *In-limine*, Black's Law at 907. And if the judge definitively resolves the issue before trial, the party need not object at trial. See United States v. Raymond, 697 F.3d 32, 37 n.4 (1st Cir. 2012).

[4] Pertinently, Rule 609 provides:

- 14 -

government wrote that the nature of his 2006 conviction — "making a materially false statement to federal agents" — made it "particularly probative of [his] credibility."

> **(a) In General.** The following rules apply to attacking a witness's character for truthfulness by evidence of a criminal conviction:
>
> > **(1)** for a crime that, in the convicting jurisdiction, was punishable by death or by imprisonment for more than one year, the evidence:
> >
> > > **(A)** must be admitted, subject to Rule 403, in a civil case or in a criminal case in which the witness is not a defendant; and
> > >
> > > **(B)** must be admitted in a criminal case in which the witness is a defendant, if the probative value of the evidence outweighs its prejudicial effect to that defendant; and
> >
> > **(2)** for any crime regardless of the punishment, the evidence must be admitted if the court can readily determine that establishing the elements of the crime required proving — or the witness's admitting — a dishonest act or false statement.
>
> **(b) Limit on Using the Evidence After 10 Years.** This subdivision (b) applies if more than 10 years have passed since the witness's conviction or release from confinement for it, whichever is later. Evidence of the conviction is admissible only if:
>
> > **(1)** its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect; and
> >
> > **(2)** the proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use.

Helpfully, both parties concede (at least implicitly) that Takesian's 2006 conviction is over ten years old, thus triggering Rule 609(b)'s proscriptions. And we see no reason to question this concession.

As for what the judge did with the motion, both sides' briefs on appeal say that the record does not reflect that he ruled on it. Just before oral argument here, however, the government's appellate lawyer sent us a letter saying that a colleague "recalled that the district court's clerk" said in an email to the attorneys for both parties during the trial that the judge "had decided to admit the prior conviction if [Takesian] testified."[5] Unfortunately, and for reasons unknown to us, the email was not made part of the record below.

Anyway, when cross-examining Takesian at trial, the government brought up how he had signed his tax returns "[u]nder pains and penalties of perjury." The government then asked him what that phrase meant to him. And he agreed it meant that he could not make "material[ly] false statements." "[A]re you the same Greg Takesian who back in the year 2006 was convicted in this court of making a materially false statement before Judge Zobel?" the government inquired. Takesian answered the question, without objection.[6] And the judge on his own initiative instructed the jurors, without objection, that the 2006 conviction

_____

[5] The body of the email reads in full: "Good morning counsel. Judge Young wanted me to inform you that if Mr. Takesian testifies, he will allow his prior convictions."

[6] His response was a little convoluted. See for yourself:

- 16 -

has nothing to do with this case.  Nothing.  It doesn't involve the tax years, it doesn't involve any of the people, it has nothing to do with this case.  So why then am I allowing you to hear about the fact of that prior conviction?  Because under the law you are entitled to take into account the fact of that prior conviction in evaluating whether you believe this witness, disbelieve this witness, believe parts of what this witness says.  You are allowed to do that.  You don't have to, but you are allowed to.  So of course it is appropriate for that fact to be brought out.

Just remember that that case, before my colleague, Judge Zobel, has nothing to do with this case, it's just a fact of conviction which you may, but are not required to, use in evaluating the credibility of this particular witness.

Takesian did object later when the government asked about his sentence for that conviction.  But he said nothing when the judge, after sustaining the objection, explained to the jurors that "[i]t's the fact of conviction that is of significance here if you decide that it bolsters the evidence."

---

Q.  Mr. Takesian, are you the same Greg Takesian who back in 2006 was convicted in this court of making a material false statement before Judge Zobel?

A.  No.

Q.  You're not that same Greg Takesian?

A.  I made a false statement in 2003 . . . .

Q.  But that was a felony conviction, sir, was it not?

A.  For wire fraud, correct.

Q.  Okay.  It also included making a false statement and a material false statement, is that correct?

A.   I don't know that it said "material false," I made a false statement . . . .

The government said nothing about Takesian's 2006 conviction in its closing argument. But as we observed earlier, the government did briefly touch on the conviction in rebuttal, without drawing any objection from Takesian: "[F]or you to believe that there was a loan in this case," the government said, "a loan that wiped out hundreds of thousands of dollars in income, you have to believe . . . Greg Takesian, who you have heard" stands convicted of a "2006 . . . felony offense of making a false statement, . . . and you can consider that evidence in evaluating his credibility."

Takesian now faults the judge for not making on-the-record findings about whether the 2006 conviction's "probative value substantially outweighed its prejudicial impact." He also contends that because "[t]he crime of making a false statement is strikingly similar to willfully filing a false tax return," he faced the prejudice of a propensity taint — *i.e.*, that "the jury might draw the impermissible inference" from the 2006 conviction that he had a natural tendency "to commit these kinds of offenses." The government, on the other hand, claims that we "do[] not require" district judges to make such "on-the-record findings" and that "the prior crime was not so similar to the instant charges that the jury" — which had received "strong," unobjected-to instructions from the judge — "could not be trusted to consider

- 18 -

the conviction only as impeachment and not as a form of propensity."

*Analysis*

The parties do not see eye-to-eye on which standard of review controls. Takesian writes that his *in limine* motion asked the judge to decide whether the probative value of his 2006 conviction substantially outweighed its prejudicial effect, preserving his Rule 609-based arguments and thus triggering abuse-of-discretion review. The government's bottom-line position is that even if the clerk's email on the *in-limine* matter is definitive enough to excuse his not objecting at trial and thus preserves his right to challenge the evidence on appeal, plain-error review applies because his arguments here differ from the ones he made below.[7]

Like the government, we assume for argument's sake (favorably to Takesian) that the email definitively resolved his *in-limine* motion, making an at-trial objection unnecessary — though we emphasize that Rule 103 requires the objecting party (here, Takesian) "to clarify whether an *in limine* or other evidentiary ruling is definitive when there is doubt on that point." See Crowe v. Bolduc, 334 F.3d 124, 133 (1st Cir. 2003)

---

[7] Takesian's appellate counsel is different from his trial counsel.

- 19 -

(quoting Fed. R. Evid. 103 advisory committee's note to 2000 amendment). Still, for the reasons given by the government, we conclude that Takesian's arguments (which differ from those advanced in the district court) get at best only plain-error review.

The caselaw on plain error "is not defendant-friendly," to say the least. See Rodríguez-Soler, 773 F.3d at 294. And that is as it should be, seeing how the goal here is to get parties to timely object to trial errors so judges can fix them without the need for costly appeals and retrials. See United States v. Domínguez Benítez, 542 U.S. 74, 82 (2004) (explaining that the plain-error "standard should . . . encourage timely objections and reduce wasteful reversals by demanding *strenuous exertion* to get relief for unpreserved error" (emphasis added)); United States v. Correa-Osorio, 784 F.3d 11, 22 (1st Cir. 2015) (similar). Takesian thus faces what seems like a 90-degree climb. See, e.g., United States v. Jiménez, 512 F.3d 1, 3 (1st Cir. 2007). And that is because to prevail on plain-error review, he must show not just (1) error, but (2) error that is clear, that (3) affected his substantial rights, and that (4) also seriously undermined the fairness, integrity, or public perception of his trial. See United States v. Rivera-Carrasquillo, 933 F.3d 33, 48 n.14 (1st Cir. 2019); see also Henderson v. United States, 568 U.S. 266, 278

- 20 -

(2013) (noting that elements three and four of the plain-error test are "screening criteria" designed to keep the "'plain error' floodgates" from opening); Puckett v. United States, 556 U.S. 129, 134 (2009) (warning that "a reflexive inclination by appellate courts to reverse because of unpreserved error would be fatal," given how "errors are a constant in the trial process" and most "do not much matter" (quoting United States v. Padilla, 415 F.3d 211, 224 (1st Cir. 2005) (Boudin, C.J., concurring))).

Takesian cannot scale plain error's difficult heights, however. He points us to no controlling law showing that we require judges to make on-the-record findings under Rule 609(b). And the provision's text does not clearly require such findings either.[8] His ultimate problem is that he did not object to the absence of findings. And if an error pressed by the appellant turns on "a factual finding [he] neglected to ask the district court to make, the error cannot be clear or obvious unless" he shows that "the desired factual finding is the only one rationally supported by the record below." See United States v. Olivier-Diaz, 13 F.3d 1, 5 (1st Cir. 1993) (quotation marks omitted). But this he has not done. So plain error is plainly lacking when it

---

[8] But see United States v. Payton, 159 F.3d 49, 57 (2d Cir. 1998); United States v. Acosta, 763 F.2d 671, 695 (5th Cir. 1985); United States v. Cavender, 578 F.2d 528, 532 (4th Cir. 1978).

comes to the on-the-record-findings issue.  See United States v. Morosco, 822 F.3d 1, 21 (1st Cir. 2016) (explaining that "plain error" is "an indisputable error by the judge, given controlling precedent" (quotation marks omitted)).

Now consider Takesian's claim that the false-statement offense underlying his 2006 conviction was so "similar" to the false-tax-return crime charged in this case that the jury might have drawn a forbidden propensity inference.  The difficulty for him is that he argued below that the 2006 conviction was "completely different from" the current "allegations" — *i.e.*, the "prior conviction[]/charge[] do[es] not resemble the present charges."  Our precedent "simply does not allow a litigant to switch horses in mid-stream, abandoning theories and arguments raised in the trial court and substituting in their place new ones raised for the first time in the court of appeals."  Campbell v. Ackerman, 903 F.3d 14, 18 (1st Cir. 2018).  This too does not suffice to satisfy the "oh-so demanding" plain-error standard.  See Rodríguez-Soler, 773 F.3d at 293.

One issue down, two to go.

### Instruction Issue

Next up is Takesian's claim that the judge botched matters by not telling the jurors that "to convict on the obstruction count," they had to "find that . . . a particular

- 22 -

administrative tax proceeding was pending" when "the defendant engaged in the obstructive conduct, or that such a proceeding was then reasonably foreseeable to him" — an omission that he says should require us to reverse his obstruction conviction.

*Setup*

A federal statute makes it a crime to "corruptly . . . endeavor[] to obstruct or impede . . . the due administration of" the internal-revenue laws. See 26 U.S.C. § 7212(a). Our law at the time of Takesian's trial did not require that prosecutors prove the defendant did the complained-of acts when the IRS proceeding was either pending or reasonably foreseeable to him — it required only that they prove that he "1) corruptly, 2) endeavored, 3) to obstruct or impede the due administration of the [i]nternal [r]evenue laws." See United States v. Floyd, 740 F.3d 22, 31 (1st Cir. 2014) (quoting United States v. Marek, 548 F.3d 147, 150 (1st Cir. 2008)). And consistent with this precedent, Takesian's indictment charged him with a range of obstructive conduct, including conduct that "predated any ongoing or foreseeable investigation by the IRS" (a quotation lifted from the government's brief, by the way).[9]

---

[9] Among other things, the indictment's obstruction count accused him of:

a. Writing checks drawn on [T & C's] bank account to his wife, landlord, and Person B.

- 23 -

Then came Marinello v. United States, a Supreme Court case decided *after* Takesian's trial. See 138 S. Ct. 1101 (2018). Marinello held that the government must also show a "nexus" between the defendant's obstructive conduct and the proceeding (*i.e.*, that his actions had a "relationship in time, causation, or logic" to the obstructed proceeding), plus show "the proceeding was pending at the time [he] engaged in the obstructive conduct or, at the least, was then reasonably foreseeable by [him]." Id. at 1109-10; see id. at 1109 (noting that an "investigation" is a "proceeding," though declining to "exhaustively itemize the types

b. Withdrawing cash from [T & C's] bank account and causing it to be deposited into bank accounts of his wife and Person B;

c. Using and causing to be used [T & C] credit cards for personal expenses;

d. Causing individual tax returns . . . to be filed, which were materially false in that they failed to report a substantial amount of income that [he] had obtained from [T & C] during the tax years;

e. Producing to government investigators purported returns for [T & C], including for tax years 2008-2011, that had not been filed with the IRS and that were false and/or misleading;

f. After learning of the federal investigation, causing false [T & C] tax returns . . . to be used with the IRS; and

g. After learning of the federal investigation, causing false amended personal tax returns . . . to be filed, which continued to under-report his income, included false losses and deductions, and falsely reported a taxable income of $0 in each of the tax years at issue.

of administrative conduct that fall within the scope of the statute"); see also id. at 1110 (adding that "[i]t is not enough for the Government to claim that the defendant knew the IRS may catch on to his unlawful scheme eventually").

Citing Marinello, Takesian argues (as we noted) that even though he offered "no objection," the judge gaffed by not instructing the jurors they had to find either that he knew about a currently pending administrative proceeding or that such a proceeding was reasonably foreseeable to him. And by his lights, the prosecutors presented insufficient evidence to satisfy the pending/reasonably-foreseeable part of Marinello — and thus, he argues, the error affected his substantial rights and leaving the error uncorrected would seriously impair the fairness, integrity, or public reputation of his trial. This is so, he says, because the evidence here is that (a) no one ever told him that he was the target of a tax investigation — indeed, IRS agent Youngquist actually told him at the August 2013 meeting that she was *not* investigating him; (b) the grand jury subpoenaed T & C's financial information not as part of any IRS investigation, but as part of the government's healthcare-fraud investigation into At Home VNA; and (c) the grand jury never subpoenaed his tax returns.

Attempting to parry these arguments, the government notes that (a) the IRS began investigating Takesian in 2012; (b) he

responded to the April 2013 subpoena in the healthcare-fraud case by producing unfiled T & C returns; (c) he admitted that IRS agent Youngquist asked questions about his and T & C's returns during his August 2013 visit to the U.S. Attorney's office; and (d) he knew from Michael's March 2014 meeting with agents (who gave Michael a grand-jury subpoena) that he and T & C were under investigation as well. And as the government sees it, regardless of whether the jury credited Takesian's explanations — *e.g.*, that he thought the feds were building a money-laundering case against him — "overwhelming evidence" shows that when he "filed versions of [T & C's] returns and [his] amended personal returns" in July or August 2014, "an investigation into his and/or [T & C's] tax returns was at least reasonably foreseeable." Which in the government's telling means that he has not shown that the error affected his substantial rights or seriously undermined the fairness, integrity, or public estimation of his proceedings.

Unconvinced by the government's reasoning, Takesian argues in reply that the government's evidence is hardly "overwhelming," seeing how his own testimony disputed the idea "that he knew that he was under investigation, or that a tax investigation was foreseeable, and took steps to obstruct that investigation."

As the parties agree, we apply plain-error review to this issue, débuted here based on the intervening Marinello decision. See Henderson, 586 U.S. at 271. And as the parties also agree, because of Marinello, the judge (to quote Takesian's brief) committed an "error that was plain" by not "instruct[ing] the jury that it had to find that there was a pending administrative proceeding or that such was reasonably foreseeable to [him]."

But the plain-error test only gives a complaining party a chance at a reversal. We say "a *chance*" because, as noted above, even if he can show a pellucid error, he must still persuade us that the error jeopardized his substantial rights — plain error's step (3); and he must also convince us that the error seriously imperiled the fairness, integrity, or public perception of his trial — plain error's step (4). Then and only then will we exercise our discretion to correct the error. See, e.g., Puckett, 556 U.S. at 135; Rivera-Carrasquillo, 933 F.3d at 48 n.14. Because Takesian stumbles at step (3), we start and end there.[10]

---

[10] A side note: Takesian's obstruction conviction does not add to his imprisonment, given that his 24-month sentence on that count runs concurrently with his 24-month sentences on the tax-fraud counts — and remember, we just upheld his tax-fraud convictions against a challenge premised on the judge's admitting the prior conviction. Something called the concurrent-sentence doctrine lets circuit courts bypass challenges to a conviction's correctness if the defendant got a concurrent sentence on another

Binding caselaw says that a defendant must show at step (3) "a reasonable probability" that the flawed instruction led to a flawed conviction.  See United States v. Marcus, 560 U.S. 258, 262 (2010); see also United States v. Henry, 848 F.3d 1, 14 (1st Cir. 2017).  But see Ramírez-Burgos v. United States, 313 F.3d 23, 29 (1st Cir. 2002) (indicating that an aggrieved party can win reversal by showing that "the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element" (quotation marks omitted)).  "A reasonable probability," our judicial superiors tell us, "is a probability sufficient to undermine confidence in the outcome" — i.e., it is more than a mere possibility, but less than a preponderance of the evidence.  See Domínguez Benítez, 542 U.S. at 83 n.9.  And keep in mind as well that a reversal on instruction-error grounds is "a remedy

---

valid count — a caveat being that he must suffer no "adverse collateral consequence" from the unreviewed conviction.  See United States v. McHatton, 16 F.3d 401, 1994 WL 41062, at *1 (1st Cir. 1994) (table) (quoting United States v. Hudacek, 7 F.3d 203, 204 n.1 (11th Cir. 1993)); see also generally Wayne R. LaFave et al., Criminal Procedure § 27.5(b) (4th ed. updated Nov. 2018) (discussing the doctrine in great detail).  Takesian spends time arguing why the doctrine does not apply, and why we must therefore consider his Marinello-based challenge to his tax-fraud convictions.  The government does not challenge Takesian on this front.  And so we say no more about the concurrent-sentence doctrine.

that is granted sparingly." United States v. Gelin, 712 F.3d 612, 620 (1st Cir. 2013).

The undisputed evidence shows that Takesian used about $1 million from T & C's accounts to cover his personal expenses (we round up to $1 million for easy reference from this point on). Everyone agrees that he did not report the $1 million as taxable income on his returns, though he had to — unless the $1 million was a loan to him. But — a big "but" — he knew the $1 million *was* indeed reportable income. And this we know because the jurors convicted him of willfully filing false personal returns, something they could only do if they dismissed his loan theory as hooey (importantly, he does not contest these convictions on appeal).

The undisputed evidence also shows that Takesian knew the IRS was investigating T & C's financial activities as part of the healthcare-fraud case against At Home VNA — an investigation that would foreseeably cast a very bright spotlight on the $1 million payout, because (remember) a subpoena requested "[a]ll" of T & C's "corporate records and books relative to [its] financial transactions." And with the IRS primed to check the flow of money to and from T & C, he concocted the fake loan theory to put one

over the revenuers.[11]  We chose each word in the last sentence advisedly, because (again) in convicting him of willfully filing false returns, the jury necessarily had to conclude that he had ginned up the loan idea to make the IRS think his use of the $1 million was on the up and up.

In arguing for reversal on the obstruction count, Takesian hypes how his "personal tax returns were never requested"; how an IRS agent early on said she "was not investigating" him; and how he "was never told he was the target of a tax investigation" (quotes taken from his reply brief).  But he never explains why an IRS investigation was not reasonably foreseeable given the special circumstances arrayed above — circumstances that show that when the IRS was investigating the money trail that could lead to him, he fabricated a loan story to throw the agency off the scent.  Also hurting him here is his testimony that he believed investigators put the screws on him because they thought he and Michael "were over paid or . . . laundering money for . . . Galatis" — of course, an IRS investigation can reasonably be foreseen in situations like those, given how "IRS special agents . . . investigate complex financial crimes associated with tax evasion, money laundering," plus "much more."  See <u>United States</u> v. <u>Pansier</u>, No. 05-CR-272,

---

[11] Recall that the unobjected-to jury instruction tied the obstruction charge to "this business about a loan."

2007 WL 1728696, at *3 (E.D. Wis. June 13, 2007) (quotation marks omitted).

The bottom line is: Given the just-described evidence indicating that Takesian could reasonably foresee that an IRS investigation of him was (in Marinello's phrasing) "at least . . . in the offing," see 138 S. Ct. at 1110, he cannot show a "reasonable probability" that a properly instructed jury would have acquitted him of the obstruction charge. See Marcus, 560 U.S. at 262 (discussing the "reasonable probability" standard). And he also cannot show that this evidence could have (in Ramírez-Burgos's parlance) "rationally led" a properly instructed jury to acquit him of that charge. See 313 F.3d at 29 (discussing the "rationally lead to a contrary finding" standard). Which means that under either standard, he has not borne his step (3) burden of proving that the error affected his substantial rights.

Enough said about this issue.

### Restitution Issue

Last up is Takesian's claim that the judge blundered by imposing the $286,433 restitution amount recommended by the probation officer in her pre-sentence report ("PSR"), when the jury found the government's tax loss was more than $100,000 but less than $250,000 — an error that he alleges should force us to

- 31 -

vacate the restitution component of his sentence and remand for a recalculation.

*Setup*

At trial, the judge instructed the jury that if it found Takesian guilty, it should use a special verdict form to decide the tax-loss amount — an amount the judge described as "the difference between what the government actually received and what the government would have received had the taxes been filled out accurately."  "[T]he burden," the judge emphasized, "is on the government to prove these things beyond a reasonable doubt."  And on the verdict slip, the jury checked a line indicating that the government's tax loss was "more than $100,000 but not more than $250,000."[12]

We should probably say a word about why the judge did what he did here.  The government tells us without contradiction that this judge's practice is to "submi[t] . . . sentencing factors

---

[12] The tax-loss-amount choices offered on the form were:
___ less than $2,500
___ more than $2,500 but not more than $6,500
___ more than $6,500 but not more than $15,000
___ more than $15,000 but not more than $40,000
___ more than $40,000 but not more than $100,000
___ more than $100,000 but not more than $250,000
___ more than $250,000 but not more than $550,000

to the jury under a beyond-a-reasonable-doubt standard." And the verdict form that he used listed seven tax-loss ranges — each corresponding to an offense level, which helps set a convicted person's advisory prison range under the federal sentencing guidelines. See USSG § 2T4.1. No party complains about this procedure. So we have no occasion to weigh in on it.

Anyhow, relying on an agent's trial testimony, the PSR computed the total tax loss to be $286,433, used the $286,433 number in calculating Takesian's guidelines prison range, and recommended that he pay the IRS $286,433 in restitution.[13] The judge at sentencing used the jury's more-than-$100,000-but-not-more-than-$250,000 finding to help set Takesian's prison range. But accepting the PSR's restitution calculation, the judge ordered Takesian to pay $286,433 to the IRS.

Takesian insists that given the jury's beyond-a-reasonable-doubt finding that the tax loss did not exceed $250,000, the judge "abused [his] discretion" by imposing restitution that exceeds that number. The government, contrastingly, contends that our precedent says that a judge "determining restitution under a preponderance standard" — which is a more-likely-than-not standard

---

[13] For anyone wondering: the government, including the IRS, may be a "victim" for restitution purposes under the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A. See United States v. Mei Juan Zhang, 789 F.3d 214, 216-17 (1st Cir. 2015).

— "may reach conclusions different from those found by the jury applying the standard of beyond a reasonable doubt."

*Analysis*

The parties fight over the proper standard of review. Takesian, for example, believes that he did enough below to preserve the argument for appeal. So, citing United States v. Kearney, 672 F.3d 81, 91 (1st Cir. 2012), he thinks that we should review the judge's restitution order for abuse of discretion, inspecting his factual findings for clear error and his legal conclusions *de novo*. The government, for its part, believes that his objections below were not specific enough to preserve review. Which, according to the government, means he must satisfy the difficult-to-meet plain-error test to get any relief. We, however, need not decide which standard applies because Takesian loses even under the one he champions. See United States v. Pena, 910 F.3d 591, 603-04 (1st Cir. 2018) (taking a similar approach in a similar situation).

Given the differing standards of proof, we see no inconsistency between the jury's finding, reflecting its view that a loss of no more than $250,000 was shown beyond a reasonable doubt, and the judge's finding, reflecting his view that a somewhat higher total of $286,433 was supported by a preponderance of the evidence. Pena controls our decision here. There, we rejected a

- 34 -

defendant's claim that the sentencer slipped by including for restitution purposes losses associated with counts for which the jury had returned not-guilty verdicts.  Id. at 603-04.  Ordering restitution on those counts was proper, we said, because a preponderance of the evidence (the standard used in arriving at a restitution figure) supported the restitution number.  See id. at 604 (emphasizing that the preponderance standard is "less stringent" than the beyond-a-reasonable-doubt standard); see also United States v. Naphaeng, 906 F.3d 173, 179 (1st Cir. 2018) (touching on restitution and the preponderance standard).

Takesian never argued here that the evidence did not suffice to allow the judge to find by a preponderance of the evidence that he owed $286,433 in restitution, thus waiving any such argument.  See, e.g., United States v. Laureano-Salgado, 933 F.3d 20, 27 n.11 (1st Cir. 2019) (discussing waiver principles); Rodríguez v. Municipality of San Juan, 659 F.3d 168, 175 (1st Cir. 2011) (ditto).  And the argument he does make — that the jury's findings under the higher beyond-a-reasonable-doubt standard tied the judge's hands in determining restitution under the lesser preponderance standard — is doomed by Pena.

## FINAL WORDS

Our work over, we *affirm* the judgment entered against Takesian.